USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __7/2/20__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATHANIEL ROBINSON, et al.,

        Plaintiffs,

-against-

NEW YORK CITY TRANSIT AUTHORITY, et al.,

        Defendants.

19-CV-1404 (AT) (BCM)

**ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Now before the Court is defendants' letter-motion dated June 19, 2020 (Def. Ltr.) (Dkt. No. 106), seeking a protective order to (1) prevent plaintiffs from taking the depositions of two senior hearing officers (SHOs), Anjelica Cappelino and Heather Widell, employed by defendant New York City Transit Authority (NYCTA); and (2) preclude testimony by a former NYCTA hearing officer, Anthony Feldmesser, whom plaintiffs first identified on June 4, 2020, pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i), as a "person likely to have discoverable information." Defendants argue that the judicial immunity doctrine bars plaintiffs from obtaining or offering testimony from any of these three witnesses, and that Feldmesser, who has been "cooperating" with plaintiffs for at least six months, was disclosed too late. Def. Ltr. at 1-3.

In their responding letter, dated June 22, 2020 (Pl. Ltr.) (Dkt. No. 107), plaintiffs argue that the testimony they seek to elicit pertains solely to the SHOs' administrative functions, rather than their judicial functions, and therefore that the discovery they seek is not barred by the judicial immunity doctrine. Pl. Ltr. at 2-3. Plaintiffs further contend that NYCTA waived any applicable judicial immunity argument through the deposition testimony of its Supervising Attorney Melissa Brody, and that they timely disclosed Feldmesser promptly after deciding that they would "rely on his testimony." *Id.* at 4. Defendants did not file any reply.

For the reasons that follow, defendants' application is GRANTED.

**Background**

Plaintiffs in this putative class action allege that the policies and procedures used by NYCTA to obtain and enforce default judgments against individuals charged by Notice of Violation (NOV) with breaking its Rules of Conduct violate the Due Process Clause. *See* First Amend. Compl. (FAC) (Dkt. No. 59) ¶¶ 1, 9. NOVs are adjudicated by hearing officers at NYCTA's Transit Adjudication Bureau (TAB), which is "a department in the NYCTA where an alleged Rule-breaker may contest the citation in an in-person hearing." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 289 (2d Cir. 2012); *see also* N.Y. Pub. Auth. Law (PAL) § 1209-a (establishing TAB and setting out its functions, powers, and duties). If the respondent fails to plead or appear by the hearing date designated on the NOV, a default judgment may be rendered, including a fine for the charged conduct and additional default penalties. FAC ¶¶ 31-32; *see also* PAL § 1209-a(6); Guidelines Governing Proceedings before the Transit Adjudication Bureau [TAB Guidelines] §§ 2.6, 3.7, 4.2.[1] That default judgment "may be entered in the Civil Court of the City of New York," FAC ¶ 33, at which point it accrues interest at the rate of 9% per year and can be enforced for up to 20 years, including by "certifying" the judgment to New York's Statewide Offset Program for "tax refund offset." *Id*. ¶¶ 35-36, 95. Plaintiffs complain, among other things, that NYCTA routinely obtains and enforces default judgments "even when it knows it sent the required notices concerning the judgments to incorrect addresses," and "even when it no longer possesses the underlying [NOV] on which the judgment is based." FAC ¶¶ 4-5.

The present discovery dispute concerns TAB's policies and procedures for vacating a default judgment, which is a necessary prerequisite for obtaining a hearing "on the merits of the

---

[1] Available at http://web.mta.info/nyct/rules/TransitAdjudicationBureau/Guidelines.pdf (last visited July 2, 2020).

original claim," TAB Guidelines § 3.7(c), and requires a determination, by a TAB hearing officer, "that good cause exists to excuse the default." *Id*. Good cause determinations are governed by the written default policy (Default Policy) (Dkt. No. 107-1) contained in TAB's manual for hearing officers, which states that "[t]here are limited excuses that TAB considers to be legally valid" and then lists those "legally valid excuses." According to plaintiffs, the Default Policy "so narrowly restricts the circumstances under which a hearing officer may vacate a [default] judgment that many people who deny ever receiving service of the initial NOV . . . lack a fair opportunity to contest the violation." Pl. Ltr. at 1. *See also* FAC ¶ 7 ("defendants impose unreasonably high standards for vacating judgments"). As plaintiffs point out, the Default Policy "does not have a catchall, such as that hearing officers may vacate judgments in the interest of justice." Pl. Ltr. at 1.

On May 28, 2020, plaintiffs took the deposition of Supervising Attorney Brody, who oversees the work of TAB's hearing officers and senior hearing officers. Brody Dep. Tr. (Dkt. No. 107-2) at 26:7-8. Brody testified that all determinations by hearing officers on requests to vacate default judgments were "reviewed by a senior hearing officer." *Id*. at 87:10-14, 94:21-25. Brody resisted comparing this process to "an appellate review," but conceded, under questioning, that in addition to making sure that there were "no typos" and that "everything is clearly written," the senior hearing officers reviewed the vacatur decisions "to make sure that the hearing officer applied the relevant rules and policies that TAB directed them to" and "considered all appropriate evidence." *Id*. at 158:12-159:10.

### SHOs Cappelino and Widell

Like federal and state judges, administrative law judges, hearing officers, and other officials who perform "the adjudicatory work of administrative agencies," *NYCLU v. NYCTA*, 684 F.3d at 300, are protected by the doctrine of absolute judicial immunity. *See*, *e.g.*, *Butz v. Economou*, 438 U.S. 478, 513 (1978) (extending judicial immunity doctrine to "federal hearing

3

examiners" within the Department of Agriculture); *McKinnedy v. Reynolds*, 2008 WL 4924947, at *5 (D.S.C. Nov. 14, 2008) (extending doctrine to South Carolina Administrative Law Court Judges, who are "absolutely immune" from suit relating to their "judicial actions"). Like a court of law, "TAB acts as an adjudicatory body, operates under procedures modeled on those of the courts, and 'impose[s] official and practical consequences upon members of society.'" *NYCLU v. NYCTA*, 684 F.3d at 300 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 595 (1980) (Brennan, J., concurring), and holding that TAB hearings are subject to a qualified First Amendment right of access). TAB's hearing officers and senior hearing officers are therefore protected by the doctrine of absolute judicial immunity to the extent they are performing the adjudicatory functions inherent in their positions.

"This absolute immunity from suit would lose its meaning if judges were nonetheless subjected to discovery and to trial." *Bliven v. Hunt*, 2006 WL 8441551, at *3 (E.D.N.Y. June 7, 2006), *report and recommendation adopted,* 2006 WL 8441552 (E.D.N.Y. June 30, 2006). Thus, where the doctrine applies, it "is not limited to immunity from damages, but also protects against discovery." *McCarty v. Douglas*, 2007 WL 9711135, at *1 (S.D. Ga. Oct. 23, 2007); *accord Ray v. Judicial Corr. Servs., Inc.*, 2014 WL 5090723, at *6 (N.D. Ala. Oct. 9, 2014); *Sykes v. Oklahoma Police Dep't*, 2014 WL 1612680, at *2 (W.D. Okla. Apr. 22, 2014); *In re Lickman*, 304 B.R. 897, 903 (Bankr. M.D. Fla. 2004).

Plaintiffs do not seriously dispute that the SHOs' adjudicative functions are immune from discovery. Nor do they seek to revisit this Court's ruling, on January 14, 2020 (Dkt. No. 80), denying broad discovery of the SHOs' emails and other electronically stored information as violative of the judicial immunity doctrine. Nonetheless, plaintiffs contend that they should be permitted to ask the SHOs, at deposition, whether and to what extent TAB's hearing officers "actually have discretion to depart from" its written Default Policy. Pl. Ltr. at 2; *see also id*. at 3

(plaintiffs intend to ask "whether and when [hearing officers] may depart from written policy"). They argue that the need for this discovery arose when TAB's Supervising Attorney testified that, "despite the plain language of the policy," hearing officers "in practice have discretion to vacate judgments for reasons than those listed in the policy." *Id*. at 1-2.[2] Plaintiffs reason that, having obtained testimony suggesting that NYCTA's default policies are less harsh than they appear in writing, they are entitled to challenge that testimony by questioning the SHOs who actually "review and either reject or approve all decisions of hearing officers." *Id*. at 2.

The testimony they seek, however, goes squarely to the SHOs' "adjudicative function" and is therefore immune from discovery. As noted above, TAB is "an adjudicatory body," and it is the hearing officers and senior hearing officers who perform its "adjudicatory work." *NYCLU v. NYCTA*, 684 F.3d at 300. Moreover, when the senior hearing officers review the decisions of the hearing officers on requests to vacate default judgments, "to make sure that the hearing officer applied the relevant rules and policies that TAB directed them to" and "considered all appropriate evidence," Brody Dep. Tr. at 158:12-159:10, and then "either reject or approve" the determination of the hearing officer, Pl. Ltr. at 2, the SHOs are engaging in quintessentially "judicial acts" that come within the protection of the judicial immunity doctrine, *Forrester v. White*, 484 U.S. 219, 227–29 (1988), as opposed to acts "that happen to have been performed by judges, but are

---

[2] Under questioning from plaintiffs' attorneys, Brody testified that the list of "legally valid excuses" for failing to attend a prior hearing set out in the Default Policy "is not exclusive." Brody Dep. Tr. at 161:19. She furnished several examples of additional (unwritten) excuses which might be accepted as good cause to vacate a default. *See id.* at 165:24-166 (testifying that a default could be excused if the respondent "had an emergency where you didn't have access to the post office, to a telephone, to any of those things"); *id.* at 166:20-167:13, (testifying that if the respondent were physically ill, "they would just need a doctor's note," even though the Default Policy appears to state that in such a case the respondent would be required to fill out TAB's "medical package"); *id*. at 168:4-14 (testifying that she was personally aware of cases where hearing officers were told that a person with a physical illness "may not necessarily need a medical package," including a case where a pregnant woman missed her hearing date because she was giving birth). In such cases, according to Brody, decisions "would be [made on a] case-by-case basis." *Id.* at 167:17-21.

5

administrative, legislative, or executive in nature," which enjoy no comparable protection. *Huminski v. Corsones*, 396 F.3d 53, 75 (2d Cir. 2005) (holding that state court judges' conduct in connection with the issuance of a "trespass notice" to a protestor who arguably threatened the security of the courthouse was "substantially judicial" and therefore shielded from the protestor's subsequent suit by the doctrine of judicial immunity).

Plaintiffs attempt to avoid the doctrine of judicial immunity by characterizing the discovery they seek as going to TAB's "general practices and policies," rather than "any particular decision of a hearing officer." Pl. Ltr. at 3. The "practices and policies" they wish to question the SHOs about, however, are those that they employ – and expect the hearing officers to employ – when making substantive legal decisions in individual vacatur cases. This case thus presents a fundamentally different question from those upon which plaintiffs rely. *See*, *e.g.*, *Forrester*, 484 U.S. at 229 ( judge was "acting in an administrative capacity" when he demoted and discharged a probation officer); *Mitchell v. Fishbein*, 377 F.3d 157, 174 (2d Cir. 2004) (members of screening committee responsible for certifying private attorneys as eligible for participation in state's assigned-counsel plan were not entitled to quasi-judicial immunity); *Morrison v. Lipscomb*, 877 F.2d 463, 464, 466 (6th Cir. 1989) (judicial immunity did not bar suit challenging state court judge's traditional holiday season "moratorium on the issuance of writs of restitution" from December 15 through January 2).

Where, as here, the discovery sought goes to how an administrative law judge makes the factual and legal determinations entrusted to her in her adjudicative capacity, the applicability of the judicial immunity doctrine does not depend on whether the party seeking to examine the judge is interested in one case or in a group of cases. Thus, in *Bliven v. Hunt*, 579 F.3d 204 (2d Cir. 2009), the court relied on the doctrine of judicial immunity to uphold the dismissal of plaintiff's claims that various state court judges "conspired" to reduce "nearly every voucher [he] submitted"

6

under New York's assigned-counsel plan, allegedly in retaliation for plaintiff having made "disfavored motions" in a series of cases to which he was assigned from 2002 to 2005. *Id*. at 207-08. Noting that each individual fee decision "is plainly a part of the judicial function performed in many cases," *id*. at 212, the Second Circuit "reject[ed] Bliven's contention that the actions of the family court judges in ruling on his vouchers . . . were not judicial acts." *Id*. at 214. *See also Hamilton v. City of Hayti, Missouri*, 948 F.3d 921, 927 (8th Cir. 2020) (state court judge was absolutely immune from a damages claim based on allegations that judge had an "established practice" that "denied indigent arrestees their constitutional right not to be imprisoned prior to trial solely because they cannot afford to pay the bond to secure their release"); *De Luna v. Hidalgo Cty., Texas*, No. CV M-10-268, 2011 WL 13282104, at *3 (S.D. Tex. June 24, 2011) (nine Hidalgo County magistrates were immune from suit for allegedly having an unwritten "policy" of "consistently jailing individuals aged 17 and older for the non-payment of fines and associated costs without making a determination of indigency and good faith effort to discharge the outstanding debt, and without offering alternatives to incarceration," thereby violating the procedural due process rights of a putative class of individuals jailed for unpaid fines or costs); *Ajaj v. MacKechnie*, 2008 WL 3166659, at *2 (S.D.N.Y. Aug. 4, 2008) (judges and court personnel were absolutely immune from plaintiff's claim that their "policy or practice" of notifying only attorneys about adverse decisions, rather than the defendants they represented, failed "to protect the public and indigent criminal defendants from lawyers who are unable or unwilling to defend them in litigation," thereby denying the indigent litigants "adequate, effective and meaningful access to the court").[3]

---

[3] Similarly, plaintiffs cannot avoid the doctrine of judicial immunity by relying on Brody's testimony that the SHOs' review of hearing officer decisions is not a "de novo" review but "more of a training." Pl. Ltr. at 3 (quoting Brody Dep. Tr. at 155:9-156:3). Training assistant district attorneys has been held to be an administrative function. *See Covington v. City of N.Y.*, 916 F. Supp.

Plaintiffs' claim that NYCTA "waived" the SHOs' judicial immunity during Brody's deposition by permitting her to answer their questions about how the Default Policy was applied by TAB fares no better. "Waiver is a voluntary and intentional relinquishment of a known right, claim, or privilege." *Ray v. Judicial Corr. Servs., Inc.*, 2014 WL 5090723, at *8 (N.D. Ala. Oct. 9, 2014) (holding that a part-time municipal judge served with a deposition subpoena did not waive his judicial immunity by sitting for deposition in a different case). Neither of the SHOs at issue here has waived her judicial immunity. Nor may NCYTA be deemed to have waived it on their behalf merely by failing to prohibit another witness – who is neither a hearing officer nor a senior hearing officer – from answering the questions posed to her by plaintiffs' counsel at deposition.

### **Former Hearing Officer Feldmesser**

Defendants also seek to preclude plaintiffs from calling former hearing officer Feldmesser as a "cooperating witness" because they failed to identify him until June 4, 2020, "more than a year after Plaintiffs served their initial disclosures and with just over a month remaining for fact discovery." Def. Ltr. at 3. Defendants note that on January 14, 2020, plaintiffs' counsel informed the Court that they were in touch with one or more unnamed former hearing officers, who were helping counsel shape their case, leading to the following colloquy:

> THE COURT:          So you're not going to call those folks as witnesses, Mr. Pierce?
>
> MR. PIERCE:          At the present time I'm not intending to call them as

---

282, 288 (S.D.N.Y. 1996). Here, however, the claim is that the SHOs were "training" the hearing officers in how to decide requests to vacate default judgments by reviewing their individual vacatur decisions for compliance with the applicable rules and standards and on that basis either rejecting or approving each such decision. Nomenclature aside, the conduct at issue falls squarely within the SHOs' adjudicatory function and is therefore shielded from discovery by the doctrine of judicial immunity. *See Steinke v. Burress*, 2003 WL 21361916, at *3-5 (E.D. Mich. June 5, 2003) (dismissing claim that state judge failed adequately to train and/or supervise his staff with regard to the appointment of counsel on appeal for indigent criminal defendants on judicial immunity grounds).

8

| | |
|---|---|
| | witnesses. |
| THE COURT: | All right. |
| MR. PIERCE: | If I decide that I do want to call them as witnesses, I'm going to have to go through various disclosures. It's possible that the other side will make a motion saying that we're late and I'll have to bear the burden of that. |
| THE COURT: | That's correct. |
| MR. PIERCE: | Understood. |

Tr. of Jan. 14, 2020 Conf. (Dkt. No. 106-3) at 32:17-33:3.

Fed. R. Civ. P. 26(a)(1)(A)(i) requires each party to identify, without awaiting an interrogatory or other formal discovery request, all individuals "*likely* to have *discoverable* information – along with the subjects of that information – that the disclosing party *may* use to support is claims or defenses[.]" (Emphases added.) There is no carve-out, under Rule 26(a)(1)(A)(i), permitting a party to withhold the name of an otherwise-disclosable witness because the party's counsel has not yet made the strategic decision whether to call that witness to testify. Fed. R. Civ. P. 26(e)(1)(A) requires the disclosing party to "supplement" its disclosure "in a timely manner." Supplementation is required when the party learns that the existing record is or has become "incomplete or incorrect" – not when that party decides, based on new deposition testimony, that it "needs" to introduce testimony from a previously-undisclosed "cooperating witness."

Under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," the court "may impose [] appropriate sanctions," including precluding the introduction of the witness altogether. In determining whether exclusion is appropriate, a court should consider four factors: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to

9

meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (internal quotation marks omitted).

The first *Patterson* factor weighs against plaintiffs, because they waited at least six months – and possibly longer – to disclose Feldmesser's identity, notwithstanding that he was "cooperating" with their counsel in pursuing this litigation. Moreover, plaintiffs were aware, at least as early as January 14, 2020, that further delay in disclosing their cooperating witness(es) could result in the remedy that plaintiffs now seek, but made a strategic decision to withhold that information. *See Rivera v. U.P.S.*, 325 F.R.D. 542, 547 (S.D.N.Y. 2018) (plaintiff offered "no plausible explanation" for failing timely to disclose the identities of potential witnesses who were not only known to plaintiff but had previously signed affidavits prepared by plaintiff).

The second *Patterson* factor – the importance of the proposed testimony from the newly-disclosed witness – also weighs against plaintiffs, because the topic on which plaintiffs expect Feldmesser to testify is "TAB's policies and practices." Pl. Ltr. at 4. The doctrine of judicial immunity applies to hearing officers no less than to senior hearing officers, and in the absence of a clear waiver prevents that hearing officer from testifying about how he (or the SHOs who reviewed his decision) believed TAB's Default Policy should be interpreted and applied to individual vacatur requests. It is not clear to the Court what other relevant testimony Feldmesser could offer, nor – if there is such testimony – why plaintiffs waited until June 4, 2020 to disclose his name as a potential witness.

The third and fourth *Patterson* factors are less weighty in this case. The fact discovery deadline – which has already been extended several times – is now July 10, 2020. (Dkt. No. 99.) It would of course be possible to extend that deadline to permit defendant to take Feldmesser's deposition. *See Rivera*, 325 F.R.D. at 547 (reopening discovery rather than precluding testimony of late-disclosed witnesses where "no summary judgment schedule has been ordered, and no trial

date has been set"). However, plaintiffs have already suffered some prejudice, in that they have completed the remainder of fact discovery while in the dark about the identity and potential testimony of plaintiffs' cooperative witness(es), and this Court is not inclined to further extend the fact discovery deadline under the circumstances here presented. *See Fleming v. Verizon New York, Inc.*, 2006 WL 2709766, at *7-8 (S.D.N.Y. Sept. 22, 2006) (noting the purpose of Fed. R. Civ. P. 37(c)(1) is to "prevent the practice of 'sandbagging' an opposing party with new evidence"). Consequently, after considering all of the *Patterson* factors, this Court declines to permit plaintiffs to rely on "policy and practice" testimony from Feldmesser.

## Sword and Shield

Plaintiffs argue, with some force, that NYCTA should not be permitted to "use judicial immunity as both sword and shield to introduce testimony on a matter it simultaneously seeks to bar from additional testimony." Pl. Ltr. at 2. Insofar as the present record shows, however, defendants have made no effort to introduce Brody's "unwritten rules" testimony into evidence, much less to rely upon it to vary the meaning or import of the Default Policy. Should such an effort be made – after defendants succeeded in preventing the SHOs or Feldmesser from testifying about how they applied the Default Policy – a number of potential remedies might be available, including the preclusion of the proffered testimony from Brody.

## Conclusion

For the reasons set forth above, defendants' letter-application is GRANTED, subject to reconsideration in the event that defendants seek to introduce evidence, from Brody or others, that TAB's hearing officers "in practice have discretion to vacate judgments for reasons other than those listed in the [Default] [P]olicy," Pl. Ltr. at 1-2, or that the Default Policy's list of "legally valid excuses" is "not exclusive." Brody Dep. Tr. at 161:19.

The Clerk of Court is respectfully directed to terminate the letter-motion at Dkt. No. 106.

Dated: New York, New York  **SO ORDERED**.
       July 2, 2020

_____

**BARBARA MOSES**
**United States Magistrate Judge**