```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/30/21
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATHANIEL ROBINSON, et al.,

               Plaintiffs,

      -against-

NEW YORK CITY TRANSIT
AUTHORITY, et al.,

               Defendants.

19-CV-1404 (AT) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs Nathaniel Robinson and David Evans, suing on behalf of themselves and a certified class, allege that the New York City Transit Authority (NYCTA), its interim President Sarah Feinberg, and its Chairman Patrick Foye violated their right to procedural due process, guaranteed by the Fourteenth Amendment to the United States Constitution, by obtaining and enforcing default judgments against them for alleged violations of NYCTA's rules of conduct, and satisfying those judgments against state tax refunds otherwise due to plaintiffs, without adequate notice or opportunity to be heard.

The parties have cross-moved for summary judgment on a number of grounds. The primary questions underlying their motions are: (1) whether defendants unconstitutionally seize tax refunds to collect unpaid fines without adequate pre-deprivation notice; (2) whether the standards used by NYCTA's Transit Adjudication Bureau for vacating default judgments are unconstitutional because they are "secret" and/or "unreasonably narrow"; and (3) whether defendants' policies and practices are unconstitutional because TAB's employees routinely fail to provide individuals wishing to challenge their default judgments with copies of their original notices of violation.

For the reasons that follow, the motions will be granted in part and denied in part.

## I.        BACKGROUND

The relevant facts, which are undisputed unless otherwise specified, are taken from: (i) plaintiffs' Statement Pursuant to Local Civil Rule 56.1 (Pl. 56.1 Stmt.) (Dkt. No. 130); (ii) the underlying evidentiary materials upon which plaintiffs rely, which are attached to the Declaration of Claudia Wilner (Wilner Decl.) (Dkt. No. 131); (iii) defendants' Statement Pursuant to Local Civil Rule 56.1 (Def. 56.1 Stmt.) (Dkt. No. 134); (iv) the underlying evidentiary materials upon which defendants rely, which are attached to the Declaration of Helene R. Hechtkopf (Hechtkopf Decl.) (Dkt. No. 135); (v) defendants' Response to plaintiffs' Rule 56.1 Statement (Def. 56.1 Resp.) (Dkt. No. 145); (vi) the underlying evidentiary materials upon which defendants rely for their response, attached to the second declaration of Helene R. Hechtkopf (Hechtkopf Opp. Decl.) (Dkt. No. 147); and (vii) plaintiffs' Response to defendants' Rule 56.1 Statement (Pl. 56.1 Resp.) (Dkt. No. 149).[1]

### A.        Facts

NYCTA operates the Transit Adjudication Bureau (TAB), which enforces and adjudicates alleged violations of the "Rules Governing the Conduct and Safety of the Public in the Use of the Facilities of the Authority" (Transit Rules). Pl. 56.1 Stmt. ¶¶ 3-5; Def. 56.1 Stmt. ¶¶ 1-3. TAB, currently led by Executive Director Mary-Ann Maloney, has adopted Guidelines that govern the

---

[1] In the Southern District of New York, the moving party must submit a "short and concise statement, in numbered paragraphs," of the material facts that it contends to be undisputed, with citations to the underlying evidence. Local Civil Rule 56.1(a). The non-moving party must then respond in kind, with numbered paragraphs that correspond "to each numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b). To the extent not "specifically controverted" by the non-moving party, the statement of material facts submitted by the moving party may be "deemed to be admitted for purposes of the motion." Local Civ. R. 56.1(c); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

proceedings before it. Def. 56.1 Stmt. ¶¶ 7-8; *see also* Hechtkopf Decl. Ex. 9 (Dkt. No. 135-9) (Guidelines).

### 1.    NOVs

When a transit infraction (which is a civil violation) is observed, a NYPD officer or MTA employee issues a Notice of Violation (NOV) to the individual who committed the alleged infraction (the respondent). Pl. 56.1 Stmt. ¶¶ 14-16. The officer must personally serve the NOV on the respondent. *Id*. ¶ 16. The NOV states, among other things: "You are hereby directed, if not answering by mail, to appear in person for a hearing at [TAB] on or before the hearing date below. Failure to do so shall be deemed an admission of the violation charged and may lead to a default judgment and subject you to the maximum penalties provided by law." Pl. 56.1 Stmt. ¶ 20; Def. 56.1 Stmt. ¶ 17. The issuing officer is required to fill out various items of information on the NOV, including the respondent's address, "details of violation," and the respondent's future hearing date should he decline to pay the fine and instead seek to challenge the violation. Pl. 56.1 Stmt. ¶ 18; Def. 56.1 Stmt. ¶¶ 14-15; Pl. 56.1 Resp. ¶¶ 14-15 (denying that issuing officers "necessarily fill in such information").

Once issued, the NOV is sent to TAB, where it is scanned into TAB's internal electronic system (TABIS) within 48 hours. Def. 56.1 Stmt. ¶¶ 21-22.[2] TAB retains the physical NOVs for 90 days and then transfers them to a document retention facility, where defendants say they are

---

[2] At present, NOVs issued since 2008 are stored on TABIS, whereas NOVs issued between 2002 and 2008 are stored on digital optical discs, and NOVs dated prior to 2002 are stored on microfilm. Pl. 56.1 Stmt. ¶¶ 30, 34.

kept for 20 years. Def. 56.1 Stmt. ¶ 25. Plaintiffs – citing the TAB Operations Manual, Hechtkopf Decl. Ex. 11 – agree only that the NOVs are kept for "some time." Pl. 56.1 Resp. ¶ 25. [3]

### 2.    Default

Respondents have 30 days from the day they are issued an NOV to pay the stated fine *or* deny the alleged violation and request a hearing. Pl. 56.1 Stmt. ¶ 44; Def. 56.1 Stmt. ¶¶ 29-30. Failure to appear or respond before the deadline constitutes a default, which is deemed an admission of liability to the violation alleged on the NOV. Pl. 56.1 Stmt. ¶¶ 45-46; Def. 56.1 Stmt. ¶¶ 31, 44. Upon default, TAB assesses a $25 penalty (in addition to the fine incurred for the alleged violation) and sends a "Default Decision and Order" to the address it has listed for the respondent, which is the one written on the NOV, unless the respondent has updated it. Pl. 56.1 Stmt. ¶ 47. The Default Decision and Order "advises the respondent of an impending judgment" and warns, among other things, that to obtain a stay of default he "must be prepared to establish a good reason for [his] failure to respond as previously directed." Pl. 56.1 Stmt. ¶ 48; Def. 56.1 Stmt. ¶ 48. [4]

Thirty days after the original default – if the cited individual has again failed to respond – TAB assesses a second $25 penalty, Pl. 56.1 Stmt. ¶ 52, at which point "a default judgment will be entered in the civil court of the New York State Supreme Court as a money judgment," accruing interest at 9% per year. Def. 56.1 Stmt. ¶¶ 50-51. Once the civil judgment is entered, yet another letter is sent to the address listed on the NOV (unless the respondent has updated it), notifying him

---

[3] Defendants, citing the TAB Operations Manual, assert that any NOV not containing sufficient legible information to make a "prima facie case" is "voided." Def. 56.1 Stmt. ¶ 26. Plaintiffs, citing the same document, correctly note that there is no "requirement" that the issuing agency "withdraw prosecution" on an NOV for this reason (which results in the issuance of a "Voidance form"), and assert that at least in some instances TAB does pursue and enforce NOVs with "illegible" prima facie elements. Pl. 56.1 Resp. ¶ 26.

[4] Because the Default Decision and Order is mailed to the address written on the NOV, the respondent may not receive it if – for example – the address was incorrect when provided, or was written incorrectly on the NOV, or the respondent has since moved. Pl. 56.1 Stmt. ¶¶ 55-57.

or her of the judgment, warning that if it is not paid, the respondent may be subject to garnishment or seizure of property, and further warning that annual interest of 9% will be added to the judgment. Def. 56.1 Stmt. ¶¶ 50-51; Pl. 56.1 Stmt. ¶¶ 53-54.[5]

### 3. SWOP

TAB participates in the Statewide Offset Program (SWOP), "which allows TAB to collect outstanding judgments by garnishing respondents' New York State income tax refunds." Pl. 56.1 Stmt. ¶ 219; Def. 56.1 Stmt. ¶¶ 57-58. An NOV may be referred to SWOP if: "there is a judgment entered in state court, the NOV has not reached the 20-year statute of limitations, the fine amount is at least $25, the respondent's full social security number has been verified, and the NOV record contains the respondent's first name, last name, and address." Pl. 56.1 Stmt. ¶ 221. TAB generates a "SWOP file" annually for referral to the Department of Taxation and Finance (DTF), which administers the program. Pl. 56.1 Stmt. ¶ 223.

Under state law, before TAB refers an NOV to DTF under SWOP, it must make a "reasonable attempt" to warn the respondent that her tax refund is at risk. Pl. 56.1 Stmt. ¶ 224; Def. 56.1 Stmt. ¶ 59.[6] Consequently, TAB sends a "SWOP letter" to the respondent's last known

---

[5] This is an automated process. "Each month, a file of NOVs that are 90 days or older are sent to the New York State Unified Court System Office of Court Administration, which enters a civil judgment against the respondents named in the file." Def. 56.1 Stmt. ¶ 52. Under New York law, judgments entered in civil court are enforceable for 20 years from the date of entry or from the date of the last acknowledgment of or payment on the judgment. Def. 56.1 Stmt. ¶ 53; Pl. 56.1 Resp. ¶ 53; *see also* N.Y.C.P.L.R. (CPLR) § 211(b).

[6] N.Y. Tax Law § 171-f(3)(c) states that, before certifying a debt to the DTF for SWOP, a state agency must have "notified the taxpayer in writing, or . . . made a reasonable attempt to so notify the taxpayer at the taxpayer's last address known to such state agency (i) that the debt, which is clearly identified as to amount and nature, is past-due and unless paid within thirty days thereafter, would be referred to the department of taxation and finance to be offset against an overpayment; (ii) that state law permits the offset of certain overpayments against such debts; (iii) that the taxpayer may request a review of the proposed referral for offset by contacting the state agency at a telephone number or an address disclosed in the notice; and (iv) that the taxpayer may present,

address, which informs her that there is a debt outstanding as a result of an unpaid NOV and that TAB is "authorized" to certify the debt to the DTF for "offset against any tax refunds, contracts, or State payments," and "provides information on actions that the respondent may take to avoid that offset," including paying the debt or disputing the matter at TAB. Def. 56.1 Stmt. ¶¶ 60-61; *see also* Pl. 56.1 Stmt. ¶¶ 225-27. The "last known address" to which the SWOP letter is sent is "the address on the NOV, unless the respondent has updated his address with TAB." Def. 56.1 Stmt. ¶ 60; *see also* Pl. 56.1 Stmt. ¶ 225. If the respondent fails to pay the outstanding TAB debt within 30 days after the SWOP letter is sent, TAB certifies the debt to the DTF for collection. Pl. 56.1 Stmt. ¶ 228.

If an offset is performed, the DTF (not TAB) so notifies the debtor and includes instructions on "how to contact the appropriate state agency."  Def. 56.1 Stmt. ¶ 63.[7]

### 4.    Vacating a Default

At any point during the above process – even after a tax offset has been performed – a respondent may seek to challenge the merits of the NOV; however, the respondent must first stay entry of or vacate the default. Pl. 56.1 Stmt. ¶ 50. A respondent who wishes to do so may come to TAB and request additional information from an "Inquiry Representative." It is TAB's practice for an Inquiry Representative to respond to such a request "by providing a printout listing violations," or what is called a "status letter," which includes (for each violation) the NOV number, the date the NOV was issued, and information about the reason the NOV was issued. Pl. 56.1 Stmt. ¶ 177;

---

to the state agency, written evidence and arguments in support of his defense to the proposed referral or may appear at a scheduled conference with the state agency to present oral arguments and written and oral evidence in support of such defense[.]"

[7] At oral argument, defendants pointed out that the post-offset notice from the DTF "goes to the address with which you filed your current tax return," which may be different from the address used by TAB to send the SWOP letter. Tr. at 27. Counsel added that TAB does not have access to the DTF database because DTF "will not share that information." *Id.* at 32.

Def. 56.1 Resp. ¶ 178. Plaintiffs contend that the status letter does not provide sufficient information to challenge a default judgment, such as "the specific times and locations of the alleged violations." Pl. 56.1 Stmt. ¶¶ 178-79. This information appears on the NOV but, according to plaintiffs, TAB employees will only provide a copy of the original NOV if the respondent specifically requests it and completes a form. Pl. 56.1 Stmt. ¶ 175.[8] Until May 1, 2019, TAB charged $10 for a copy of an NOV. Pl. 56.1 Stmt. ¶ 180. TAB now charges $1 for a copy, *id.* ¶ 181, though it still charges $10 for a copy of a Default Decision and Order. *Id.* ¶ 184.

In order to stay or vacate a default judgment, the respondent must show "good cause." N.Y. Pub. Auth. Law (PAL) § 1209-a(9)(c)(1)(iii); Guidelines § 3.7(c). The form provided to respondents for this purpose asks them to state all reasons in support of their request but does not "define 'good cause' or list what evidence will be considered." Pl. 56.1 Stmt. ¶ 61. According to the manual provided to the TAB hearing officers who determine such requests, the respondent must have a "legally valid" excuse for failing to respond to the NOV in a timely manner. Def. 56.1 Stmt. ¶ 55; Pl. 56.1 Stmt. ¶¶ 50, 60; Wilner Decl. Ex. 31 (Dkt. No. 131-31) (HO Manual) at 2. There are four legally valid excuses to vacate a default judgment: lack of personal jurisdiction (this category includes "a false identification defense, wrong respondent, or lack of service"), lack of TAB jurisdiction (including that the respondent was under 16), "no prima facie case," or lack of mental/physical capacity to respond in a timely manner. Def. 56.1 Stmt. ¶ 55; Pl. 56.1 Stmt. ¶ 71; HO Manual at 2. However, this list is not made publicly available. Pl. 56.1 Stmt. ¶¶ 65-70. Among the excuses that TAB does not accept as legally valid are: lack of funds, drug or alcohol addiction

---

[8] Defendants dispute this, asserting no written request is required if the respondent appears in person. Def. 56.1 Resp. ¶ 175. On February 26, 2019 (after this lawsuit commenced), TAB adopted a new policy requiring dismissal of an NOV if TAB is unable to locate its own copy of the NOV within 60 days of a respondent's request to stay entry of or vacate a default. Pl. 56.1 Stmt. ¶ 109.

(with some exceptions), incarceration (with some exceptions), or "[f]ailure to receive default notices," unless the failure was caused by TAB's error "resulting in mail being sent to the wrong address." Def. 56.1 Stmt. ¶ 56; Pl. 56.1 Stmt. ¶ 74; HO Manual at 2-3.

According to plaintiffs, from May 2016 through June 2020, TAB "granted only 646 requests to vacate a default judgment on the basis that the NOV did not establish prima facie evidence." Pl. 56.1 Stmt. ¶ 128. However, vacatur requests were granted for other reasons as well. During the same period of time, TAB received a total of 7,999 requests to vacate default judgments, of which it denied 3,969, or 49.6%, Wilner Decl. Ex. 50 (Dkt. No. 131-50) at ECF pages 8-9, suggesting that slightly over half of all vacatur requests during this period were granted.

If TAB grants a respondent's request to vacate a default, the respondent may proceed to an in-person hearing on the merits of the underlying NOV (if it was not already dismissed when TAB granted the request to vacate) or may proceed via "adjudication by mail." Def. 56.1 Stmt. ¶¶ 37-38; Pl. 56.1 Stmt. ¶¶ 130-31. A final decision is rendered either dismissing the NOV or finding that the charge has been established, and the respondent is notified of the decision. Def. 56.1 Stmt. ¶ 39. A respondent can appeal the decision to the TAB Appeals Board within 30 days of the decision. Def. 56.1 Stmt. ¶¶ 40-42. After that, if unsatisfied, a respondent can bring an article 78 proceeding in state court. *Id.* ¶ 43.

TAB's hearing officers, who receive training and apply written guidelines, have authority in deciding whether a default judgment should be vacated and whether an NOV is upheld, or not, on the merits. Def. 56.1 Stmt. ¶¶ 33-35.[9]

---

[9] Defendants assert that the hearing officers have "sole" authority, while plaintiffs claim that hearing officers' decisions are subject to review and approval by senior hearing officers. Pl. 56.1 Resp. ¶¶ 33, 39.

5.      **Bad Addresses**

One of plaintiffs' primary complaints is that some of the addresses that TAB records and relies on to send notices to respondents are incorrect. The respondent will not receive *any* notices (apart from the original NOV) if, for example, the ticketing officer does not record a mailing address on the NOV (which he is not required to do), or if a respondent does not provide an address, or does not have one. Pl. 56.1 Stmt. ¶ 199.

Where the NOVs do list addresses for the respondents, some of them are inaccurate. Pl. 56.1 Stmt. ¶¶ 200-03. The parties dispute how many of them are inaccurate. *Id.*; Def. 56.1 Resp. ¶¶ 200-03. An internal audit issued in 2018 found that 43.22% of the 56,146 summonses sent to an external collection agency from January through August 2017 "were marked as having a bad postal address on the TABIS system," apparently because earlier mail sent to those addresses had been "[r]eturned from U.S. Post Office." *See* Wilner Decl. Ex. 57 (Dkt. No. 131-57), at 2-3 (MTA Audit). However, the same audit noted that 55.2% of the 154,692 summonses issued in 2016 were paid, *id.* at 1, suggesting that – at most – 43.22% of the remaining 44.8% (or 19.36% of the total) had bad addresses. Similarly, a New York State Comptroller report concerning TAB's collection efforts, issued in 2016, stated that approximately 40% of a random sample of summonses with "outstanding fines and fees" were "designated as having a bad address." *See* Wilner Decl. Ex. 58 (Dkt. No. 131-58), at 1, 8 (Comptroller Rep).[10] However, the "random sample" consisted of only 150 NOVs, *id.*, some dating back to 2013, all of which had "balances due" and 7 of which were already "enrolled in SWOP," *id.* at 8-9, suggesting that the overall percentage of bad addresses on NOVs was likely lower. Elsewhere, the Comptroller Report stated that of 858 summonses "entered

---

[10] As to these, the Comptroller's staff was able to "obtain a more accurate address" for 26 out of 59 (or 44.1%) "without a significant investment of time using the DMV database." Comptroller Rep. at 8.

into the database" on a particular day (May 15, 2015), 157, or 18.3%, "had errors," including incomplete addresses. *Id*. at 8. It is not clear what portion of these errors were significant enough to prevent delivery of a mailed notice to the recorded address.

The parties agree that TAB does not use LexisNexis, nor cross-reference the Department of Motor Vehicles (DMV) database (to which it has access), to attempt to improve its address accuracy, Pl. 56.1 Stmt. ¶¶ 210-13, though defendants dispute how helpful the information available within LexisNexis would be as to any particular respondent. Def. 56.1 Stmt. ¶¶ 210-13.

### 6.   The Named Plaintiffs

A detailed recitation of the named plaintiffs' circumstances and experiences appears in the Court's class certification decision,[11] and will not be repeated here. Broadly speaking, plaintiffs attest that they were surprised to learn that money had been taken from their tax refunds in relation to NOVs issued by NYCTA many years prior. They claim that they did not receive (or did not recall receiving) any mailed notices from NYCTA after their initial NOVs were issued, though both concede that at times during the relevant period they had no fixed address. *See* Hechtkopf Decl. Ex. 8 (Dkt. No. 135-8) (Evans Tr.) at 40-42, 50-52; Hechtkopf Decl. Ex. 7 (Dkt. No. 135-7) (Robinson Tr.) at 19-20, 26-28. The certified class includes individuals who are or were homeless, on public benefits, and/or incarcerated at the time their NOVs were issued or thereafter. Pl. 56.1 Stmt. ¶¶ 238-40.

### B.   Procedural History

Plaintiffs filed this action on February 13, 2019, and filed their First Amended Complaint (FAC) (Dkt. No. 59) on October 11, 2019, alleging that various aspects of the NOV enforcement

---

[11] *See Robison v. New York City Transit Authority*, 2020 WL 5884055 (S.D.N.Y. Aug. 31, 2020), *report and recommendation adopted*, 2020 WL 5814189 (S.D.N.Y. Sept. 30, 2020).

process, summarized above, deprive plaintiffs of their procedural due process rights under the Fourteenth Amendment. FAC ¶¶ 228-30.

After plaintiffs moved for class certification pursuant to Fed. R. Civ. P. 23(b) (Dkt. No. 62), I recommended certifying the following class: "All persons against whom [NYCTA] has obtained or will obtain a default judgment in a New York State court. Excluded from the class are persons whose default judgments are not subject to enforcement because they (1) have been fully satisfied by voluntary payment or (2) fall outside the twenty-year statute of limitations period applicable under CPLR 211(b)." *Robinson*, 2020 WL 5884055, at *1, 14. On September 30, 2020, the Honorable Analisa Torres, United States District Judge, adopted the report and recommendation in its entirety and certified the class. *Robinson*, 2020 WL 5814189.

Following certification, on November 11, 2020, both plaintiffs and defendants moved for summary judgment. Plaintiffs' motion (Dkt. No. 128) was accompanied by their memorandum of law (Pl. Mem.) (Dkt. No. 129); their Rule 56.1 Statement; and the Wilner Declaration. Defendants' motion (Dkt. No. 132) was accompanied by their memorandum of law (Def. Mem.) (Dkt. No. 133); their Rule 56.1 Statement; and the Hechtkopf Declaration. On January 5, 2021, defendants filed their brief in opposition to plaintiffs' motion (Dkt. No. 146), accompanied by their response to plaintiffs' Rule 56.1 Statement, and the Second Hechtkopf Declaration. That same day, plaintiffs filed their brief in opposition to defendants' motion (Dkt. No. 148), accompanied by their response to defendants' Rule 56.1 Statement. On January 26, 2021, the parties filed their reply briefs (Dkt. Nos. 150, 151.) On April 13, 2021, I heard oral argument on the cross-motions. *See* Tr. of Apr. 13, 2021 Videoconference (Tr.) (Dkt. No. 155).

The parties have consented to my jurisdiction, pursuant to 28 U.S.C. § 636(c), to hear and determine the summary judgment motions. (Dkt. Nos. 120, 121.)

## II.      DISCUSSION

### A.      Legal Standards

#### 1.      Summary Judgment Standards

A federal court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 128-29 (2d Cir. 1996). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 322; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). In evaluating the record, the court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to establish a genuine dispute of material fact. *Celotex,* 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). The non-moving party must present specific, admissible evidence in support of her contention that there is a genuine dispute as to the material facts. *Celotex,* 477 U.S. at 324; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful"). Furthermore, the evidence must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *Anderson,* 477 U.S. at 242, 248. Thus, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir. 1996).

### 2. Due Process

"The touchstone of due process . . . is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976)) (internal quotation marks omitted). However, "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 170 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In determining how much process is due, a court must weigh three factors: "(1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interest." *Id.* (citing *Mathews*, 424 U.S. at 335).

### B. The Parties' Arguments

The key questions on summary judgment boil down to three: (1) whether TAB seizes money from respondents' tax refunds without constitutionally sufficient pre-deprivation notice reasonably calculated to reach those respondents; (2) whether TAB's standards for vacating defaults are unconstitutional because they are secret, unreasonably narrow, or both; and (3) whether TAB's employees unconstitutionally fail to provide copies of NOVs to respondents on request – especially older NOVs – even though once a default judgment is entered on such an NOV it can be enforced for up to twenty years. *See* Tr. at 6-7.[12]

---

[12] Plaintiffs confirmed during oral argument that they are not challenging the *content* of the NOV itself. Tr. at 8, 17-18. Nor do they argue that the *content* of TAB's various mailed notices is inadequate; rather, in plaintiffs' view, it is TAB's practice of sending "a notice to nowhere" that violates the Constitution. Tr. at 9. Plaintiffs also confirmed that they are not challenging the $1 fee now charged to obtain a copy of an NOV, and agreed that the question whether the $10 fee was too high (as alleged in the FAC) is now moot, since plaintiffs solely seek prospective injunctive relief and not damages. Tr. at 51.

As to the first question, plaintiffs argue that the seizure of tax refunds is a "significant deprivation of property" for which due process requires, at minimum, "notice and opportunity for [a] hearing appropriate to the nature of the case," *Smith v. Onondaga Cnty. Support Collection Unit*, 619 F. Supp. 825, 828 (N.D.N.Y. 1985), and therefore that defendants violate their right to due process by failing to provide notice that is reasonably calculated to reach them prior to seizing their tax refunds. Pl. Mem. at 7-8. In particular, plaintiffs argue, TAB improperly continues to rely on the address in the NOV itself to send out all of its follow-up notices, including the SWOP letter, and makes no effort to take "reasonable follow-up measures," even though it is aware that many of those notices do not reach their intended recipient because of "bad addresses" in the system. *Id.* at 9-11.

Defendants argue that TAB's process is constitutionally sufficient and that the *Mathews* factors weigh in their favor, noting that they have repeatedly been applied in a "very similar scenario" to uphold the procedures used by the New York City Parking Violations Bureau (PVB) to collect unpaid parking tickets. Def. Mem. at 11-14, 21-25. In this case, defendants note, even if a respondent does not receive TAB's notices by mail because of a "bad address," that respondent was already on notice of the violation, and the need to contest (or pay) the NOV, because the original NOV was personally served at the time of the violation. *Id.* at 22. Defendants further contend that the missives it sends by mail thereafter, which include two default notices and the SWOP letter, are "reasonably calculated" to apprise a respondent of the risk to her tax refund and afford her an opportunity to object. Defendants point out that state law *requires* that the SWOP letter be sent to the debtor's last known address ("not some other address plucked out of a public records search"), and argue that the work required to perform public record searches for "hundreds of thousands [of] individuals each year" would be "extraordinarily prohibitive." *Id.* at 23-24.

14

Defendants add that any deficiency in the pre-deprivation notice process is cured by the post-deprivation process afforded to respondents in the form of an opportunity to seek vacatur of the default and contest the NOV, even after a tax refund has been seized through SWOP. *Id*. at 24-25.

As to the second question, plaintiffs argue that TAB's failure to publish its "good cause" standards for vacating default judgments and the unreasonably narrow standards themselves – both independently and together – violate due process. Pl. Mem. at 13-15. Defendants, for their part, assert that having a "proscribed" list of acceptable excuses does not violate any respondent's due process rights, and that similar or even more restrictive criteria have been upheld against due process challenges in other cases. Def. Mem. at 17.

As to the third question, plaintiffs contend that TAB denies them due process by failing to provide copies of NOVs and other information essential to challenging default judgments. Specifically, plaintiffs complain that the only unsolicited document a TAB Inquiry Representative provides to a respondent is a "Status Letter," which is essentially a list of violations, and which does not – in plaintiffs' view – contain sufficient information to allow the respondent to challenge the default. Moreover, even if a respondent specifically requests a copy of her NOV, Inquiry Representatives do not always provide the requested document, particularly if the NOV is older and not in TABIS. Pl. Mem. at 20-26. In response, defendants deny that TAB employees refuse access to NOVs (or other documents), and further contend that TAB keeps all NOVs for the entire time in which it may try to enforce a default judgment based on those NOVs. Def. Mem. at 18-19.

### C.    Analysis

#### 1.    The Pre-Deprivation Notice Provided by TAB is Constitutionally Sufficient

"Due process does not require that a property owner receive actual notice before the government may take his property.  Rather . . . due process requires the government to provide

'notice *reasonably calculated*, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)) (emphasis added); *see also Weigner v. City of New York,* 852 F.2d 646, 649 (2d Cir. 1988) (due process "does not mean that all risk of non-receipt must be eliminated").

Defendants are correct that the basic adjudicative process utilized by TAB has been upheld in this Circuit – from a procedural due process perspective – in cases involving a substantially similar process used by the New York City PVB. *See, e.g.*, *Schaer v. City of New York*, 2011 WL 1239836, at *8-9 (S.D.N.Y. Mar. 25, 2011) (holding "[t]he City's administrative parking violations system" constitutional under the Due Process Clause, even though its procedures "place the onus for resolving outstanding tickets on the driver, rather than on the City," and collecting cases); *Rackley v. City of New York*, 186 F. Supp. 2d 466, 480-83 (S.D.N.Y. 2002) (holding that defendants provided plaintiff "with more than sufficient process to satisfy the Constitution" before entering default judgments against him and seizing his car to satisfy unpaid parking tickets). The PVB cases, however, do not directly address the issue presented here, which is whether a series of otherwise-adequate mailed notices can be rendered constitutionally inadequate by evidence that a non-trivial number of those notices did not reach their intended recipients.[13]

In considering that issue, the Court notes that the evidence concerning how many addresses in the TABIS system are actually incorrect, and what it would take to correct them, is fairly skimpy.

---

[13] In *Yu Juan Sheng v. City of New York*, the court wrote that "[t]he notice requirement is met when a parking ticket is placed on a windshield, because such service is 'reasonably calculated, under . . . the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" 2009 WL 6871132, at *10 (E.D.N.Y. June 26, 2009) (quoting *Mullane*, 339 U.S. at 314). However, the plaintiff in *Yu Juan Sheng* did not "deny receiving any of the additional notices typically sent by the PVB concerning outstanding unpaid parking tickets." *Id*. at *9.

16

With regard to the proportion of inaccurate addresses: Plaintiffs rely on the 40% "bad address" figure in the Comptroller Report. *See* Pl. Mem. at 10. However, as noted above, that figure was derived from a small sample of significantly aged receivables: 150 unpaid summons "issued since January 1, 2013, with outstanding fines and fees." Comptroller Rep. at 8. The same report states that 18.3% of the summonses "entered into the database" on a particular day had address errors, *id.* – still a significant number, to be sure, but less than half the error rate cited in plaintiffs' brief. With regard to what it would take to correct the bad addresses: The Comptroller Report stated that "we were able to obtain a more accurate address for 26" of the "59 uncollected NOVS" in the small sample "without a significant investment of time using the DMV database." *Id.* However, over 150,000 NOVs are issued each year, *see* MTA Audit at 1, and 56,146 unpaid NOVs were sent to an external collection agency during the first eight months of 2017 alone. *Id.* at 3. Those 56,146 unpaid NOVs represented $8,592,088 in uncollected fines – on average, $153 per NOV, *id.* – which is also relevant, under *Mathews*, to the question of how much process is due. Moreover, it is unclear to the Court how much "more accurate" the DMV database is. For individuals like the named plaintiffs, who were in difficult personal circumstances while TAB was pursuing violations against them and at times had no fixed address, it is also unclear what efforts would have sufficed – if indeed any would – to successfully deliver notices to them by mail.

Although the Court cannot determine with precision what proportion of TAB's mailed SWOP letters were sent to "bad addresses," the number is clearly more than *de minimis*, and I agree with the parties that the record is sufficient for me to determine whether this fact – that a non-trivial portion of those letters went to addresses known by defendants to be "bad" – imposed

upon defendants a constitutional obligation to correct (or attempt to correct) the errors.[14] On this point, plaintiffs rely on *Jones v. Flowers*, *supra*, and its progeny, for the proposition that defendants are obligated to take further action when mail is returned to them as undeliverable. *See* Pl. Mem. at 11-12. In my view, however, the case is not helpful to plaintiffs.

Jones was delinquent in paying his property taxes. The Commissioner of State Lands in Little Rock, Arkansas attempted to notify him of this fact – and that he had a right to redeem the property – by mailing him a certified letter at his house address. *Jones*, 547 U.S. at 223. The letter also advised that if he did not redeem the property, "it would be subject to public sale two years later." *Id.* Because no one was "home to sign for the letter, and nobody appeared at the post office to retrieve the letter within the next 15 days," the post office "returned the unopened packet to the Commissioner marked 'unclaimed.'" *Id.* at 223-24. Two years later – after another certified letter was returned unclaimed – the house was sold for $80,000, and the new owner "had an unlawful detainer notice delivered to the property," which prompted Jones' lawsuit. *Id.* at 224.

The Court held that "when mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, *if it is practicable to do so*." *Jones*, 547 U.S. at 225 (emphasis added). In *Jones* itself, given that "the subject matter of the letter concern[ed] such an important and irreversible prospect as the loss of a house," *id.* at 230, the Court concluded that "additional reasonable steps were available to the State." *Id.* at 225. Among other things, the Commissioner could have simply re-sent the notice by *regular* mail so that no signature would have been required, *id.* at 234-35, posted a notice on the front door, or addressed the undeliverable mail to "occupant." *Id.* at 235. However,

---

[14] Plaintiffs argue that TAB had a number of "non-burdensome options" to correct known bad addresses, but only identify two: using the DMV database and running "person searches" in LexisNexis. Pl. Mem. at 12.

the Court expressly rejected Jones' claim that "the Commissioner should have searched for his new address in the Little Rock phonebook and other government records such as income tax rolls." *Id.* at 235-36. "We do not believe the government was required to go this far." *Id.* at 236. The Court also noted that if "there were no reasonable additional steps" for the government to take, it could not be "faulted for doing nothing." *Id.* at 234.

Following *Jones*, the Second Circuit held in another tax foreclosure case presenting similar facts that "it would not have been a terrible burden" for the government to send the property owner "a first-class letter" after a notice sent by certified mail was returned unclaimed. *Luessenhop v. Clinton Cnty., New York*, 466 F.3d 259, 270 (2d Cir. 2006). *Luessenhop* noted that the rule announced in *Jones* was specific to real property takings, *id.*, and further observed that, "although in *Jones* the Court found that there were minimally burdensome followup measures available to the state, the Court did predict that there may be some instances where 'there were no reasonable additional steps the government could have taken upon return of the unclaimed notice letter,' and in those situations the government could not 'be faulted for doing nothing.'" *Luessenhop*, 466 F.3d at 271 (quoting *Jones*, 547 U.S. at 234). Significantly, in both *Jones* and *Luessenhop*, the "reasonable additional step" that the court prescribed for the tax-collecting agency was to send a letter by ordinary first-class mail. *See also Weigner*, 852 F.2d at 651 ("The Supreme Court has repeatedly held that notice by first-class mail is sufficient, notwithstanding the Court's obvious awareness that not every first-class letter is received by the addressee.").

The loss of an anticipated New York State tax refund can be "a significant deprivation of property." *Smith*, 619 F. Supp. at 828. However, the "private interests" at stake here, *Mathews*, 424 U.S. at 325, do not demand the same level of procedural protection as the "important and irreversible prospect" of losing a home, *Jones*, 547 U.S. at 230, or a livelihood, *see Spinelli*, 579

F.3d at 171 ("[t]he Supreme Court has repeatedly recognized the severity of depriving someone of his or her livelihood") (internal quotation marks and citation omitted). Moreover, the notice that defendants provided (or attempted to provide) was both substantively adequate and utilized a delivery method repeatedly endorsed by the federal courts as consistent with the requirements of the Due Process Clause. Thus, the first *Mathews* factor does not strongly favor plaintiffs.

The second *Mathews* factor requires the court to consider "the risk of an erroneous deprivation of such interest through the procedures used, *and* the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335 (emphasis added). Here, the known bad addresses in TABIS present a clear risk of "erroneous deprivation," but it is not clear how many respondents actually face that risk.[15] Further, the "probable value" of the "additional or substitute procedural safeguards" proposed is questionable at best, since the Comptroller was able to obtain "more accurate addresses" for only 44% (26 out of 59) of the uncollectable NOVs it researched, Comptroller Rep. at 8, and there is no empirical information in the file as to whether those "more accurate" addresses would have sufficed to provide the respondents with actual notice.

On the other side of the ledger, the third *Mathews* factor – the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," 424 U.S. at 335 – is weighty. Even with the assistance of SWOP, TAB is only able to collect "approximately half" of the fines assessed.

---

[15] In order to turn an uncollected NOV over to SWOP, TAB must, among other things, have an accurate social security number for the respondent. *See* Def. 56.1 Stmt. ¶ 64. According to the Comptroller Report, only 7 of the 150 uncollected past-due NOVs it examined were "enrolled in SWOP," which "may be due to failing to collect Social Security numbers as well as accurate addresses." Comptroller Rep. at 9. Even after an NOV is "enrolled" in SWOP, no offset can occur unless a tax refund is due. In 2017, TAB sent 344,263 NOVs to SWOP. Def. 56.1 Stmt. ¶ 67. (This figure presumably includes those with good addresses, such that the respondents actually received a pre-deprivation SWOP letter, as well as those with bad addresses.) Of that total number, TAB received payment from 15,751 (4.6%). *Id.*

Comptroller Rep. at 1. Moreover, the "additional reasonable steps" that plaintiffs claim NYCTA should have taken before turning plaintiffs' unpaid, post-judgment NOVs over to SWOP (updating or correcting their mailing addresses via the DMV database or by conducting research using LexisNexis) are precisely the steps that – because of their labor-intensive nature – the government is *not* required to undertake even when it knows that a property owner did not receive the certified letter sent to him prior to the more significant deprivation of a tax foreclosure sale. *Jones*, 547 U.S. at 236; *Luessenhop*, 466 F.3d at 271.

Having evaluated the record presented to me by the parties in light of the *Mathews* factors, I conclude that, on the specific facts of this case, the notice that defendants provided to NOV respondents before seizing their tax refunds – including the personal delivery of the NOV itself and three further written notices sent by mail to the address on the NOV, one of which specifically warns that the debt is being referred to the DTF to be offset against any available tax refund – is constitutionally adequate. Accordingly, defendants are entitled to summary judgment on this point.

### 2.    TAB Fails To Provide Adequate Notice of Its Vacatur Standards

Plaintiffs contend that TAB's vacatur standards are unconstitutional because they are (1) secret, and (2) unreasonably narrow. In plaintiffs' view, TAB should be required to tell respondents seeking to vacate default judgments what will and will not qualify as "good cause" under N.Y. Pub. Auth. Law § 1209-a(9)(c)(1)(iii) and the Guidelines, *see* Pl. Mem. at 13-15, and should also be required to broaden the categories that do qualify, so as to match (or at least approach) the more lenient standard applied under CPLR § 5015(a), which permits a litigant to vacate a state court default judgment on grounds including illness preventing travel, inclement weather, and inability to arrange care for a disabled child. Pl. Mem. at 17. I agree that TAB must publish its "good cause" standards, but not that it needs to broaden them.

For the first point, plaintiffs rely principally on *Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005), which involved the denial of energy assistance benefits to low-income families, and *Nnebe v. Daus*, 931 F.3d 66 (2d Cir. 2019), which involved the summary suspension of taxicab drivers' licenses after they were arrested. *Kapps* is inapposite, as it did not involve any prospective standard at all. Rather, the Second Circuit held that when the government denies benefits, its "notice of benefits determinations must provide claimants with enough information to understand the reasons for the agency's action," *Kapps*, 404 F.3d at 123, because without adequate information about what the agency *did*, "[c]laimants cannot know whether a challenge to [the] agency's action is warranted, much less formulate an effective challenge." *Id*. at 124 (emphasis deleted).

*Nnebe* is closer to the mark. Appellants were taxi drivers whose licenses were automatically suspended after they were arrested for certain crimes but who were entitled to a hearing before the New York City Taxi and Limousine Commission (TLC) to determine whether to lift the summary suspension pending resolution of the criminal case. Until 2006, drivers were given no information whatsoever about the standard to be applied at the hearing, *Nnebe*, 931 F.3d at 72; in particular, they were not told that the only factors the TLC's administrative law judges (ALJs) considered were: (i) whether the driver had in fact been charged with a crime; (ii) whether the charge was still pending; and (iii) whether the charged crime had a "nexus to public health or safety," which was a "philosophical question" that did not depend on facts or evidence. *Id*. at 73 (internal quotation marks omitted). Not only did the TLC keep quiet about the standard actually applied; the ALJs "encouraged drivers to argue anything they wanted – including that they were not a threat to health or public safety or that they were innocent," none of which mattered to the outcome of the hearings, which resulted in almost every case in the driver remaining on suspension. *Id*. at 73-74. On these facts, the Second Circuit held that the notice provided to the drivers was

constitutionally infirm, because it failed to "inform the affected party of what 'critical issue' will be determined at the hearing." *Id*. at 88 (quoting *Turner v. Rogers*, 564 U.S. 431, 447 (2011)). The court explained,

> While we do not imply that adequate notice must include a roadmap to a successful defense, the notice here falls considerably on the other side of that line. The text of the Rule pre-2006, as well as the encouragement given to drivers by the TLC ALJs, gave the driver no indication that the only issue that mattered was the question of a "philosophical nexus" between the abstract elements of a charged offense and public safety, for which he or she would need to marshal a dramatically different case – case law and legal argument – than he or she would to show evidence of his or her own lack of dangerousness. Indeed, the misleading quality of the notice was confirmed by the fact that drivers did present, and ALJs were instructed to admit, evidence regarding their individual records and the specific facts charged by the arresting officer – evidence that the ALJs were then privately directed not to consider.

931 F.3d at 88-89.

The stakes in *Nnebe* were higher than in the case at bar, because suspending a taxi driver's license deprives him of his "livelihood," and the injury cannot necessarily be redressed by reinstatement weeks or months later, after the criminal case has run its course. 931 F.3d at 84. Thus, the "private interest at stake" was "enormous." *Id*. In other respects, however, *Nnebe* is on point. TAB's vacatur proceedings can function, among other things, as a post-deprivation remedy after a respondent's tax refund has been seized. *See* Pl. 56.1 Stmt. ¶¶ 247-449 (detailing experiences of named plaintiffs and other class members after learning that their tax refunds had been applied to their TAB debts). TAB, like the TLC, has developed a clear set of concrete standards for its hearing officers to use when adjudicating that post-deprivation remedy – specifically, a list of "legally valid excuses" – but does not share those standards with the respondents seeking the remedy, informing them only that they must establish "good cause to excuse the default." Guidelines § 3.7(c). As a result, the respondents may fail to marshal the relevant facts or make an effective argument. The lack of transparency thus creates a risk of "erroneous deprivation," easily

remedied by adding an accurate summary of the qualifying excuses to the Guidelines, the vacatur request form (both of which are available on NYCTA's website),[16] or other public-facing media.[17] On the other side of the ledger, the government has no cognizable interest in keeping the list of valid excuses secret, and does not argue that it would be unduly burdened by making them public. *Cf. Smith*, 619 F. Supp. at 829 & n.4 (suggesting in *dicta* that pre-1984 notice given to taxpayers whose refunds could be seized to satisfy delinquent child support obligations was constitutionally inadequate, but noting that since 1984 New York State had properly sent a written notice which, among other things, listed the principal defenses to the threatened seizure).

I recognize that, in other contexts, statutes and regulations frequently articulate a flexible "good cause" standard without expressly spelling out what will and will not qualify as good cause. Here, however, as in *Nnebe*, the agency has and applies a "list," at the post-deprivation remedy stage, but chooses to keep that list nonpublic. I therefore conclude that, as to this issue, the defendants have failed to provide constitutionally adequate notice.

 The actual standard applied, however, is not so "unreasonably narrow," Def. Mem. at 18, as to constitute an independent due process violation. "Inclement weather preventing attendance" may be grounds for vacating a default judgment in a New York state court, *id*. (citing *Millard v. Wyche*, 164 A.D.3d 778, 780 (2d Dep't 2018)), but plaintiffs have cited no authority, and I have found none, for the proposition that this (or any other particular excuse) is constitutionally required as grounds for vacating a default entered by TAB.[18] Moreover, the numbers simply do not support

---

[16] *See* https://new.mta.info/agency/transit-adjudication-bureau/forms (last visited Sept. 30, 2021).

[17] If, as TAB personnel testified in this action, the list of legally valid excuses "sets forth guidelines and is not exhaustive," *see* Def. 56.1 Resp. ¶ 64, the published standards should of course so state.

[18] In order to avoid the entry of default on an NOV, a respondent is not required to appear on any fixed day. If she wishes to deny the violation, she may appear in person at TAB on "any business day" up to and including the hearing date designated on the NOV, *or* "request an alternate hearing

plaintiffs' position that the grounds provided to vacate a default judgment are so narrow as to render the process an exercise in futility. Roughly half of all vacatur requests are granted, Wilner Decl. Ex. 50 at ECF pages 8-9, including one of the requests made by one of the named plaintiffs. Wilner Decl. Ex. 35 (Dkt. No. 131-35) (Evans Decl.) at ¶ 20 (vacating one default judgment out of ten). *Cf. Nnebe*, 931 F.3d at 72-74 (under pre-2006 rule, TLC ALJs recommended that the driver's suspension be lifted "in only three cases out of hundreds of hearings," and the TLC Chairperson, charged with the ultimate decision, never lifted a suspension). As to this issue, therefore, it is defendants who are entitled to summary judgment.

### 3.    A Genuine Dispute of Material Fact Exists as to Defendants' Policy and Practice Concerning Providing Copies of NOVs to Respondents

The Court cannot grant summary judgment to plaintiffs or to defendants on the third major issue argued in their papers – whether TAB denies due process to respondents by failing to provide copies of the underlying NOVs to those seeking to challenge a default judgment – because there is a clear dispute of material fact on this point. The parties agree that when a respondent walks into TAB, seeking information about a default judgment, TAB employees are trained to begin by providing the individual with a "status letter," which offers only a broad summary of violations. Pl. 56.1 Stmt. ¶¶ 177-79; Def. 56.1 Stmt. ¶ 69. The parties further agree that a respondent must specifically request a copy of her NOV if she wishes to obtain it. As a matter of training and practice, TAB employees do not volunteer to provide that document. Pl. 56.1 Stmt. ¶¶ 174-76; Def. 56.1 Resp. ¶¶ 174-76.

---

date in person, by mail, or by calling the telephone number indicated on the NOV," *or* deny the charge in writing, by "checking the box on the back of the NOV," completing the form supplied, and mailing it in. Guidelines § 2.2(b); *see also* Def. 56.1 Stmt. ¶¶ 17-19. Thus, it is hardly surprising that some of the grounds accepted as good cause to vacate a court default are not accepted as "legally valid excuses" at TAB.

However, the parties disagree as to whether TAB employees, as matter of training and/or practice, routinely *refuse* to provide NOVs to respondents. Citing deposition testimony from TAB Inquiry Representative Tracy Blaise, defendants say that there is "no evidence that the Inquiry Desk has a policy of refusing to provide NOVs to respondents." Def. Mem. at 18; *see also* Def. 56.1 Stmt. ¶ 70. Ms. Blaise testified about the process in place once a respondent requests a copy of an NOV: "if they want a copy of the ticket . . . we have request forms. That's what it's called. And then they put the information in, and from that point on . . . there's a fee for the ticket . . . once they're through paying . . . you give them a copy of their ticket." Hechtkopf Decl. Ex. 6 (Dkt. No. 135-6) at 71-72; Def. 56.1 Stmt. ¶ 70. For their part, plaintiffs admit that Ms. Blaise "testified about a process for providing a NOV to a respondent on request," but deny "that this process is always used to provide a copy of a NOV to a respondent." Pl. 56.1 Resp. ¶ 70. Plaintiffs point to declarations and deposition testimony by the named plaintiffs, and other class members, who attest that they requested copies of their NOVs many times but did not receive them. *See* Wilner Decl. Ex. 37 (Dkt. No. 131-37) (Robinson Decl.) at ¶¶ 8-10, 13-14, 27; Evans Decl. at ¶¶ 14, 16-17, 29-31; Wilner Decl. Ex. 38 (Dkt. No. 131-38) (Quiles Dep.) at 26-30; Wilner Decl. Ex. 40 (Dkt. No. 31-40) (Washington Decl.) at ¶¶ 7-11; Wilner Decl. Ex. 39 (Dkt. No. 131-39) (Washington Dep.) at 31, 36, 40, 43; Wilner Decl. Ex. 18 (Dkt. No. 131-18) (White Decl.) at ¶¶ 1, 11. Because there is a genuine dispute of material fact as to this issue – which the Court understands to be a deliberate indifference claim, *see* FAC ¶ 230[19] – it cannot be resolved on motion prior to trial.

---

[19] The Second Circuit has articulated three requirements for a cognizable deliberate indifference claim based on a failure to train or supervise public employees. *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). First, plaintiff "must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* Second, plaintiff must demonstrate "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling

III.    **CONCLUSION**

For the reasons discussed above, defendants' motion (Dkt. No. 132) is **GRANTED IN PART** and **DENIED IN PART**. Likewise, plaintiffs' motion (Dkt. No. 128) is **GRANTED IN PART** and **DENIED IN PART**. Specifically:

Defendants' motion is granted, and plaintiffs' motion is denied, with regard to the adequacy of the notice provided by TAB to respondents prior to the seizure of their tax refunds.

Plaintiffs' motion is granted, and defendants' motion is denied, with regard to TAB's failure to disclose its standards concerning the legally valid excuses to vacate a default judgment.

Defendants' motion is granted, and plaintiff's motion is denied, with regard to the substance of TAB's standards concerning legally valid excuses to vacate a default judgment.

Both motions are denied with regard to the issue of whether TAB has an unconstitutional policy or procedure of refusing to provide copies of NOVs to those seeking to challenge default judgments or has failed adequately to train its personnel on providing such copies.

The Court will conduct a case management conference on **October 21, 2021**, at 12:00 p.m., in Courtroom 20A of the Daniel Patrick Moynihan United States Courthouse. Prior to the conference, and no later than **October 18, 2021**, the parties shall submit a joint letter discussing their proposed next steps; what efforts they have made or will make to settle this case; and what the Court can do to assist them in that regard.

---

the situation." *Id.* Finally, plaintiff "must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.*

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 128 and 132.

Dated: New York, New York
       September 30, 2021

                                  **SO ORDERED.**

_____

**BARBARA MOSES**
**United States Magistrate Judge**