UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATHANIEL ROBINSON, et al.,

        Plaintiffs,

   -against-

NEW YORK CITY TRANSIT
AUTHORITY, et al.,

        Defendants.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 01/24/2022

19-CV-1404 (AT) (BCM)

**MEMORANDUM AND ORDER
REGARDING RECONSIDERATION**

**BARBARA MOSES, United States Magistrate Judge.**

By motion dated October 15, 2021 (Dkt. No. 158), plaintiffs seek partial reconsideration, pursuant to Local Civil Rule 6.3 and Fed. R. Civ. P. 59(e), of the Court's Opinion and Order dated September 30, 2021 (Op.) (Dkt. No. 157), insofar as the Court granted summary judgment to defendants on plaintiffs' claim that defendants' procedures for providing pre-deprivation notice prior to seizing state tax refunds to collect unpaid transit fines are constitutionally inadequate. Plaintiffs argue that the Court erred in two respects: (1) by overlooking or misconstruing Supreme Court and Second Circuit precedent that – in plaintiffs' view – requires a government agency to conduct additional research if it knows that some of the mailing addresses it relies on to provide pre-deprivation notice are incorrect; and (2) by characterizing the additional measures proposed by plaintiffs as "labor intensive" without an adequate evidentiary record. Plaintiffs no longer argue (as they did in their original motion papers) that they should be granted summary judgment on the issue of pre-deprivation notice; rather, they now contend that this issue should be resolved at trial. For the reasons that follow, the Court will reconsider its Opinion and Order, but upon reconsideration will adhere to its prior ruling.

## Background

Plaintiffs Nathaniel Robinson and David Evans, suing on behalf of themselves and a certified class, allege that the New York City Transit Authority (NYCTA) and its personnel

violated their right to procedural due process, guaranteed by the Fourteenth Amendment to the United States Constitution, by obtaining and enforcing default judgments against them for violations of NYCTA's rules of conduct, and satisfying those judgments against plaintiffs' state tax refunds, without adequate notice or opportunity to be heard. On November 11, 2020, after discovery, the parties cross-moved for summary judgment. One of the issues presented to the Court on that motion was whether NYCTA's Transit Adjudication Bureau (TAB) "seizes money from respondents' tax refunds without constitutionally sufficient pre-deprivation notice reasonably calculated to reach those respondents." Op. at 13.

Plaintiffs did not quarrel with the content or timing of the notices that NYCTA provides to individuals accused of violating the transit rules. *See* Op. at 13 n.12.[1] Rather, they argued that TAB's notices are not "reasonably calculated, under all the circumstances," to apprise respondents of the risk to their tax refunds, as required by *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950), because "a material portion of notices sent as part of the NOV enforcement process are returned as undeliverable," and TAB "makes no effort to remedy bad addresses, thereby resulting in notices that TAB knows will likely not reach the intended recipient." Pl. Mem.

---

[1] The material facts regarding the notices are undisputed. When a transit infraction (a civil violation) is observed, a police officer or NYCTA employee personally issues a Notice of Violation (NOV) to the individual who committed the alleged infraction (known as the respondent). Op. at 3. The NOV warns that a failure to pay the prescribed fine or contest the ticket "shall be deemed an admission of the violation charged and may lead to a default judgment and subject you to the maximum penalties provided by law." *Id.* Thereafter, if the respondent nonetheless fails to pay the fine or contest the NOV, TAB sends out three written notices, by mail, before ultimately referring the unpaid fine to the Statewide Offset Program (SWOP), where the debt can be collected by garnishing any state income tax refund otherwise due to that respondent. Op. at 3-6. The second written notice, sent after a default judgment has been entered on the unpaid NOV in state court, warns the respondent that if the judgment is not paid he or she may be subject to garnishment or seizure of property. Op. at 4-5. The third written notice, mailed before the judgment is referred to SWOP, expressly advises the respondent that "there is a debt outstanding as a result of an unpaid NOV" and that "TAB is 'authorized' to certify the debt to the DTF [Department of Taxation and Finance] for 'offset against any tax refunds, contracts, or State payments.'" Op. at 5-6. This notice also "'provides information on actions that the respondent may take to avoid that offset,' including paying the debt or disputing the matter at TAB." *Id.*

in Opp. to Def. Summary Judg. Mtn. (Dkt. No. 148) at 15.[2]

Defendants, for their part, acknowledged that some of TAB's mailed notices did not reach the named respondents – and that TAB takes no affirmative steps to update "bad addresses" in its database, known as TABIS – but argued that the notice provided is nonetheless constitutionally sufficient, particularly given that: (i) the original NOV is personally delivered to each respondent; (ii) it would be a "clear undue burden for TAB to try to track down the new addresses of hundreds of thousands of individuals to collect small sums from each"; (iii) if it did undertake that research, it "would have no way of ensuring that the new address it obtained from public records would be a more accurate address than the address provided by the respondent at the time he or she received the NOV"; and (iv) when a tax refund is seized, a post-seizure notice is mailed (by the DTF, not TAB) to the address given by the respondent on his or her tax return, after which the respondent has a meaningful opportunity to vacate the judgment and contest the underlying NOV. *See* Def. Mem. in Supp. of Summary Judg. Mtn. (Dkt. No. 133) at 14-15, 21-26.[3]

---

[2] The material facts regarding "bad addresses" are likewise undisputed. All of TAB's mailed notices are sent to the address that the respondent provided when the NOV was issued, unless the respondent updates that address. Op. at 4, 6. If the address was incorrect when provided, or written incorrectly on the NOV, or if the respondent had no fixed address, or has since moved, TAB's written notices may not reach that respondent at all. Op. at 4, 8. TAB flags addresses as "bad" when a notice is returned undeliverable, but does not take any systematic affirmative steps to correct or update those addresses – by, for example, looking in the Department of Motor Vehicles (DMV) database, or researching the respondent through LexisNexis. *Id.* at 10.

The summary judgment record did not pinpoint the percentage of NOVs referred to SWOP that had bad addresses. Plaintiffs focused on a 2016 report by the Office of the State Comptroller (Comp. Rep.) (Dkt. No. 131-58) finding that 40% of a small sample of 150 past-due NOVs with "outstanding fines and fees" (60 out of 150) were "designated as having bad addresses." *See* Comp. Rep. at 1, 8; Op. at 9, 16-17. Elsewhere, the same report found "errors" in 18.3% of the addresses listed on the new NOVs issued on a single day in 2015 (157 out of 858), but did not reveal what portion of those errors were significant enough to prevent delivery of a mailed notice to the recorded address. Comp. Rep. at 8; Op. at 10, 16-17. For purposes of summary judgment, the Court accepted that a "non-trivial" number of TAB's mailed notices "did not reach their intended recipients." Op. at 16, 17.

[3] The material facts concerning the size and scope of the SWOP program are undisputed. In 2017, TAB sent 344,263 NOVs to SWOP. Op. at 20. No offset can occur, however, unless the NOV can

Both plaintiffs and defendants sought summary judgment in their favor on this issue, and all parties agreed that the record (although "fairly skimpy" concerning "how many addresses in the TABIS system are actually incorrect, and what it would take to correct them," Op. at 16) was sufficient for the Court to determine whether the pre-deprivation notice provided by defendants was or was not constitutionally sufficient under *Mullane* and the balancing test prescribed by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Op. at 17-18; *see also* Tr. of April 13, 2021 Argument (Tr.) (Dkt. No. 155) at 11 (plaintiff's counsel, agreeing that despite the lack of "hard numbers" for the incorrect addresses, "this [is] something [the Court] can decide on summary judgment[] either way").

Applying the three-factor *Mathews* balancing test, the Court found that while the loss of an anticipated New York State tax refund can be a significant deprivation of property, the relatively modest "private interests" at stake here, *Mathews*, 424 U.S. at 334, do not demand the same level of procedural protection as the prospect of losing a home or a livelihood. Op. at 19. The Court further noted that the notice that defendants provided (or attempted to provide) was both substantively adequate and utilized a delivery method – first class mail – repeatedly endorsed by the federal courts as consistent with the requirements of the Due Process Clause, including in *Jones v. Flowers*, 547 U.S. 220, 234-35 (2006), and *Luessenhop v. Clinton Cnty.*, New York, 466 F.3d 259, 270 (2d Cir. 2006), both of which involved tax foreclosures on plaintiffs' homes. The Court therefore concluded that "the first *Mathews* factor does not strongly favor plaintiffs." Op. at 20.

---

be matched to a New York State taxpayer and a tax refund is due to that taxpayer. What this means, as a practical matter, is that only a small percentage of the NOVs referred to SWOP are collected through garnishment. In 2017, TAB received payment, via SWOP, on 15,751 NOVs (approximately 4.6% of the total sent that year). *Id.* Although the parties did not present precise figures concerning the amount of money garnished through SWOP on a per-NOV basis, it is undisputed that the average amount of the unpaid NYCTA fine referred to various forms of collection as of 2017 was $153 per NOV. *Id.* at 17.

Turning to the second *Mathews* factor – "the risk of an erroneous deprivation of such interest through the procedures used, *and* the probable value, if any, of additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335 (emphasis added) – the Court found that although the known bad addresses in TABIS "present a clear risk of 'erroneous deprivation,'" that risk was not faced by all or even most members of the class,[4] because only 4.6% of the NOVs referred to SWOP are successfully collected against the respondents' tax returns. Op. at 20 & n.15. Moreover, the Court noted, the "probable value" of the "additional or substitute procedural safeguards" proposed, namely, that TAB look for respondents' current addresses in the DMV database or run "person searches" in LexisNexis," *see* Pl. Mem. in Supp. of Summary Judg. Mtn. (Dkt. No. 129) at 12, was "questionable at best." Op. at 20.[5]

On the other side of the ledger, the Court found that the third *Mathews* factor – the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," *Mathews*, 424 U.S. at 335 – is "weighty" in this action. Op. at 20. NYCTA struggles to collect the fines it issues, and even with the help of SWOP is only able to collect "approximately half" of those assessed. *Id.* Moreover:

> [T]he "additional reasonable steps" that plaintiffs claim NYCTA should have taken before turning plaintiffs' unpaid, post-judgment NOVs over to SWOP (updating or correcting their mailing addresses via the DMV database or by conducting research using LexisNexis) are precisely the steps that – because of their labor-intensive

---

[4] The certified class includes "[a]ll persons against whom [NYCTA] has obtained or will obtain a default judgment in a New York State court," except for those whose judgments can no longer be enforced because they have been voluntarily paid or they are more than 20 years old. (Dkt. Nos. 115, 123.)

[5] The only evidence on this point in the summary judgment record was one sentence in the Comptroller's Report: "[W]hen we researched the 59 uncollected NOVs in our sample [of 150] with 'bad addresses,' we were able to obtain a more accurate address for 26 [44%] without a significant investment of time using the DMV database." Comp. Rep. at 8. Plaintiffs provided no evidence as to whether those 26 "more accurate" addresses were accurate enough so that mail sent to them would have provided the respondents with actual notice, *see* Op. at 20; Comp. Rep. at ECF page 24 (NYCTA comment), and no evidence as to the probable value of any other methods (such as LexisNexis research) for correcting the "bad addresses" in TABIS.

> nature – the government is *not* required to undertake even when it knows that a property owner did not receive the certified letter sent to him prior to the more significant deprivation of a tax foreclosure sale. *Jones*, 547 U.S. at 236; *Luessenhop*, 466 F.3d at 271.

Op. at 21 (emphasis in the original). The Court concluded that, "on the specific facts of this case, the notice that defendants provided to NOV respondents before seizing their tax refunds . . . is constitutionally adequate." Op. at 21. It is this conclusion that plaintiffs now challenge.

## Legal Standards

Reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 613, 614 (S.D.N.Y. 2000)). Here, reconsideration is sought pursuant to Rule 59(e), which requires that motions to alter or amend a judgment be filed within 28 days after entry of the judgment, and Local Civil Rule 6.3, which requires that motions for reconsideration or re-argument of a court order be served within 14 days after the determination of the original motion. The substantive standards are the same under both rules, *see NEM Re Receivables, LLC v. Fortress Re, Inc.*, 187 F. Supp. 3d 390, 394 n.2 (S.D.N.Y. 2016); *Glendora v. Pinkerton Sec. & Detective Servs.*, 1999 WL 46633, at *1 (S.D.N.Y. Feb. 1, 1999) (collecting cases), and are intended to be "strict." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked" and that "might reasonably be expected to alter the conclusion reached by the court." *Id.* It is the movant's burden both to identify the "controlling decisions or material facts that were before [the court] on the original motion" but were overlooked, and to demonstrate that those decisions or facts "might materially have influenced its earlier decision." *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014) (quoting *Anglo Am. Ins. Grp. v. CalFed, Inc.*, 940 F. Supp. 554, 557 (S.D.N.Y. 1996)) (internal quotation marks omitted). A motion for reconsideration

"is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)) (quoting *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 144 (2d Cir. 1998)).

"The decision to grant or deny a motion for reconsideration 'rests within the sound discretion of the district court,'" *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 5408171, at *1 (S.D.N.Y. Sept. 27, 2016) (quoting *Williams v. Rosenblatt Secs. Inc.*, 2016 WL 590232, at *4 (S.D.N.Y. Feb. 11, 2016)), and is reviewed "only for abuse of discretion." *Analytical Surveys*, 684 F.3d at 52.

### Controlling Precedent

Plaintiffs rely on *Robinson v. Hanrahan*, 409 U.S. 38, 40 (1972) (per curiam), and *Akey v. Clinton Cty., New York*, 375 F.3d 231, 233 (2d Cir. 2004), arguing that these decisions (which they cited in their original summary judgment briefs but which the Court did not expressly discuss in its Opinion and Order) "hold that a government defendant does not provide adequate due process when it sent notice of forfeitures to addresses which it knows or should know are incorrect," Pl. Recon. Reply Mem. (Dkt. No. 163) at 1, and thus that NYCTA likewise did not provide adequate due process when it mailed multiple written pre-deprivation notices to respondents with unpaid transit fines, prior to turning over the resulting civil judgments to SWOP, but failed to "take steps aimed at correcting 'bad addresses'" in its TABIS database. Pl. Recon. Mem. (Dkt. No. 159) at 4. Plaintiffs further argue that the Court "misconstrued" *Jones* and *Luessenhop*, which – they argue – did not approve the sending of notices by mail to "known bad addresses." *Id.* at 5.

Defendants, for their part, argue that none of the cases relied on by plaintiffs is directly on point, in that none of them "addresses a situation of a government entity sending out thousands of notices for collection of relatively small amounts of money." Def. Mem. in Opp. to Recon. Mtn.

(Dkt. No. 162) at 4. Defendants add that this case is further distinguishable because each respondent "has already received a notice, by personal service, of the initiation of the proceeding." *Id.* at 5.

Having carefully considered the parties' arguments – and the authorities relied upon – the Court is not persuaded that it overlooked or misconstrued any controlling caselaw. Plaintiffs' argument, in a nutshell, is that where, as here, a government agency *knows* that some of the mailing addresses in its database are inaccurate, it is required – as a matter of federal constitutional law – to undertake *some* additional effort to update or correct those addresses before seizing funds to satisfy judgments, regardless of the volume of the database, the efficacy or cost of the update effort, or the size of the individual judgments that the agency seeks to collect. I do not read the cited cases as requiring that result, particularly where, as here, each respondent was, at the initiation of the proceeding, personally handed a written NOV warning that the failure to either pay the fine or contest the charge "may lead to a default judgment and subject you to the maximum penalties provided by law." Op. at 3.

In *Robinson*, the appellant was arrested for armed robbery and jailed for four months while awaiting trial. 409 U.S. at 38. During that period, the State of Illinois instituted civil forfeiture proceedings against Robinson's car, alleged to have been used to commit the crime. *Id.* Although the State knew that Robinson was in jail, it mailed the only notice of the forfeiture proceedings to his home. *Id.* On these facts, the Court held, *per curiam*, that notice of the forfeiture was inadequate because it was not "reasonably calculated, under all the circumstances," to apprise Robinson of the pendency of the forfeiture proceeding. *Id.* at 40 (quoting *Mullane*, 339 U.S. at 314).

*Robinson* is distinguishable from the case at bar with respect to each of the three *Mathews* factors. *First*, the private interest implicated in *Robinson* – a car – is significantly more substantial than a transit fine averaging $153. *See, e.g.*, *City of Los Angeles v. David*, 538 U.S. 715, 717-18

(2003) (even a "temporary deprivation" of the use of an individual automobile "typically works a far more serious harm" than the deprivation of a "monetary interest"); *Krimstock v. Kelly*, 306 F.3d 40, 61 (2d Cir. 2002) (noting "[t]he particular importance of motor vehicles derive[d] from their use as a mode of transportation and, for some, the means to earn a livelihood").

*Second*, both the "risk of erroneous deprivation" and the "probable value of other safeguards," *Mathews*, 424 U.S. at 335, were clear in *Robinson*, where the appellant was wholly unaware that the civil forfeiture proceedings had been commenced until after he was released from jail (at which point the forfeiture had already been concluded), 409 U.S. at 39,[6] and where the State knew exactly where he was – in State custody. *Id.* Here, by contrast, each class member was handed an NOV which (although it did not expressly advise that the respondent's future state tax refunds could be at risk) clearly warned that a legal proceeding had been commenced, that it was the respondent's obligation to either pay or contest the NOV, and that the failure to do so could result in a "default judgment" and "the maximum penalties provided by law." Op. at 3. Moreover, in this case, although NYCTA knew that thousands of addresses in its database were incorrect, it did not know the correct addresses for *any* of those respondents.

*Third*, the governmental effort required to provide better notice in *Robinson* was *de minimis*, given that the State knew where Robinson was (and similarly knew the whereabouts of any other incarcerated criminal defendant subject to forfeiture proceedings). Not so here. NYCTA did not know where to find the respondents with "bad addresses," and had no assurance that the research efforts proposed by plaintiffs, even if feasible on such a large scale, would have sufficed

---

[6] Plaintiffs argue that Robinson "obviously had notice of the pending criminal proceeding." Pl. Recon. Reply Mem. at 3. Under applicable Illinois law, however, the forfeiture proceeding was a separate action commenced by the filing of a civil complaint. *See People ex rel. Hanrahan v. One 1965 Oldsmobile*, 52 Ill. 2d 37, 41, 284 N.E.2d 646, 650, *rev'd sub nom. Robinson v. Hanrahan*, 409 U.S. 38 (1972). Appellant had no notice whatsoever of that civil proceeding until his release from jail. *Robinson*, 409 U.S. at 38-39.

to provide those respondents with actual notice.[7] Moreover, while Robinson was by definition the owner of a car subject to civil forfeiture, only a small portion of the respondents referred to SWOP (4.6% in 2017) will actually suffer the garnishment of a tax refund. *See* Op. at 20.

Plaintiffs fare no better with *Akey*, which – like *Jones* and *Luessenhop* – arose out of property tax foreclosure proceedings. Clinton County used first class mail to send notices of foreclosure to "all taxpayers who had failed to pay 1996 and/or 1997 taxes on commercial or vacant properties." 375 F. 3d at 233.[8] The addresses were obtained from the tax rolls in the County's Real Property Services Office. *Id.* Just before the properties were auctioned off, one of the delinquent taxpayers filed a class action on due process grounds. *Id.* The seven appellants in *Akey* were homeowners who had filed proofs of claim in an effort to join the class action, but whose claims were denied after trial. *Id.* at 234-35. On appeal, the Second Circuit reversed and remanded as to two of the seven: McDonald and Akey.

McDonald's notice was mistakenly mailed to his former address (a post office box), where he "denied ever receiving it." *Akey*, 375 F. 3d at 236. The County itself had required McDonald to change his mailing address (from the post office box to a street address) in 1992, when it implemented a 9-1-1 emergency response system, but then failed to "update its own tax records," *id.*, resulting in the mistaken mailing to an obsolete address. The Court of Appeals held that these facts established "a *potential* due process violation," because "the County was responsible for the change that made his address inaccurate in the first place." *Id.* (emphasis added).

---

[7] Some members of the certified class, including both named plaintiffs, were homeless and/or incarcerated for periods of time while their NOVs were pending. *See* Op. at 10. For these plaintiffs, and for others with no fixed address, it is unlikely that a search of the DMV database or LexisNexis research would have resulted in a "good" mailing address on which NYCTA could have relied to provide actual notice of the SWOP referral.

[8] The underlying facts are set forth in more detail in *Farbotko v. Clinton Cty., NY*, 168 F. Supp. 2d 31 (N.D.N.Y. 2001), which explains that "approximately 525" property owners were notified in this manner. *Id.* at 35-36.

Akey's notice was returned to the County as undeliverable. 375 F.3d at 236. The County searched for an alternate address in its tax records and in the 1998 tax roll for the Town of Champlain, where Akey's property was located, to no avail. *Id.* The district court "held that this limited search fulfilled the County's due process obligations," *id.*, but the Second Circuit disagreed, because the tax rolls of the County's "other towns and villages, totaling 17 in all, were readily available in the County's offices," and "[h]ad the County availed itself of these public records, it would have found a correct address for Akey in the Town of Schuyler Falls." *Id.*

*Akey* is also distinguishable from the case at bar. *First*, the "private interest" at stake in *Akey* (as in *Jones* and *Luessenhop*) could not be weightier: the "important and irreversible" prospect of losing real property. *Jones*, 547 U.S. at 230; *see also Krimstock*, 306 F.3d at 61 (the "deprivation of real . . . property involves substantial due process interests"). *Second*, the risk of erroneous deprivation was clear and threatened *every* member of the class (all of whom owned real property, had failed to pay their property taxes, and thus faced foreclosure). Moreover, at least as to appellant McDonald, the risk was created by the County's own mistake and remediable by looking at the County's own records. 375 F.3d at 235-36. *Third*, although the Court of Appeals required Clinton County to search the tax rolls of 17 towns and villages for Akey's address, those records "were readily available in the County's offices." *Id.* at 236. Even in a real-property case, where the private interest is at its height, the County was not required to cross-reference records compiled by other governmental agencies or use internet research tools. Moreover, of the 525 foreclosure notices that the County mailed in 1999, "approximately eighty-one" were returned as undeliverable. *Farbotko*, 168 F. Supp. 2d at 36. NYCTA, by contrast, issues over 150,000 NOVs

11

each year, and sent over 344,000 unpaid NOVs to SWOP in 2017 alone,[9] only 15,751 of which were matched with a tax refund that could be garnished. *See* Op. at 17, 20 n.15.[10]

      For these reasons, neither *Robinson* nor *Akey* compels a different result here. Nor did the Court misconstrue *Jones* and *Luessenhop*. Plaintiffs are correct that neither case stands for the proposition that notice is necessarily adequate "so long as it is sent by 'ordinary first-class mail.'" Pl. Recon. Mem. at 5 (quoting three words from Op. at 19). Neither, however, do they support plaintiffs' contrary contention: that notice sent by first-class mail is necessarily *inadequate* whenever – as here – the agency "knows" that some of those notices are going to "bad addresses." Rather, as the Court reaffirmed in *Jones*, "assessing the adequacy of a particular form of notice requires balancing the 'interest of the State' against 'the individual interest sought to be protected[.]'" 547 U.S. at 229 (quoting *Mullane*, 339 U.S. at 314). In performing that balancing test in the specific context of a tax foreclosure proceeding, where the "loss of a house" is at stake, the Court concluded that when "mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner, *Jones*, 547 U.S. at 225, 230, but those "additional reasonable steps need not include searching the local phonebook or "other governmental records such as income tax rolls." *Id.* at 235-36 ("We do not believe the government was required to go this far."). The Court added that if there were "no reasonable additional steps" for the government to take, it could not be "faulted for doing nothing." *Id.* at 234. *Luessenhop*, which was also a real property case, echoed this point. 466 F.3d at 270.[11]

---

[9] The Court surmises that the 344,000 figure includes unpaid NOVs from multiple years.

[10] Plaintiffs now suggest that TAB "may be seizing as many as 50,000-125,000 tax refunds each year through SWOP." Pl. Recon. Mem. at 8. There is no support in the evidentiary record for this figure.

[11] *Caplash v. Johnson*, 230 F. Supp. 3d 128 (W.D.N.Y. 2017), which plaintiffs cite for the first time in their reconsideration briefs, also involved "a much greater deprivation than the loss of an anticipated state tax refund," Def. Mem. in Opp. to Recon. Mtn. at 5 – namely, the denial of an opportunity to reopen an immigration petition. *Caplash*, 230 F. Supp. 3d at 138-39.

In the Opinion and Order, after performing the required balancing test, the Court concluded that on the "specific facts of this case" the notice provided by defendants was not constitutionally inadequate. Op. at 19-21. Those specific facts include the personal delivery of the NOV to each respondent when a proceeding is initiated; the mailing of three follow-up notices, sent to the address initially furnished by the respondent; the enormous volume of NOVs that NYCTA must attempt to enforce; the small percentage of SWOP referrals that actually result in the garnishment of a tax refund; the relatively low stakes involved in any one tax refund seizure; and the existence of a reasonably robust *ex post* mechanism for vacating an NOV and reclaiming the seized funds post-garnishment. *See* Op. at 8. As the Supreme Court has repeatedly explained, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). It was and is the view of this Court that the "particular situation" presented here does not demand that defendants search the DMV database or perform LexisNexis research in an effort to find better addresses for all respondents whose mailed notices are returned as undeliverable.

### Construction and Sufficiency of Evidence

Plaintiffs' second challenge is evidentiary. They complain that in performing the balancing test required by *Mathews*, the Court failed to draw all evidentiary inferences in their favor, as required on summary judgment. Pl. Recon. Mem. at 7-8. For example, according to plaintiffs, the Court should have accepted "the New York State Comptroller's findings that 40% of NOVs audited contained bad address information[.]" Pl. Recon. Mem. at 7. Plaintiffs further argue that defendants were not entitled to summary judgment because they "failed to introduce any evidence regarding the specific factual burdens they claim would have resulted from Defendants' being required to update their address records." Pl. Recon. Mem. at 9-10; Pl. Recon. Reply Mem. at 4-6.

As to the first point, plaintiffs mischaracterize the Opinion and Order. The Court did not reject the 40% figure upon which plaintiffs rely (notwithstanding that it was derived from a small sample of 150 significantly past-due NOVs, *see* Comp. Rep. at 8-9; Op. at 9-10). Nor did the Court rest its analysis on the alternative 18.3% figure (appearing in the same report) derived from the Comptroller's review of new NOVs being entered into the database in 2015. Comp. Rep. at 8; Op. at 10. Rather, after noting that the evidence on this point was "skimpy," the Court *accepted*, for summary judgment purposes, that "the number [of bad addresses] is clearly more than *de minimis*," and that a "non-trivial portion" of the letters mailed by TAB "went to addresses known by defendants to be 'bad.'" Op. at 16-17. Thus, while plaintiffs are correct that there is a "question," which neither side answered with precision, concerning exactly "how many class members are not receiving notices due to bad addresses," Pl. Recon. Mem. at 8, that question – as plaintiffs' counsel acknowledged at oral argument, *see* Tr. at 11 – was not material to the legal determination that the Court was required to make on summary judgment.[12]

As to the second point, plaintiffs mistakenly assert that there was no evidence before the Court as to "the fiscal and administrative burdens," *Mathews*, 424 U.S. at 335, that would result from a judicially imposed requirement that NYCTA attempt to update its TABIS database by cross-checking bad addresses against the DMV database. It is true, as plaintiffs point out, that

---

[12] It bears emphasizing here that when summary judgment is sought in a procedural due process case, the "final question [of] what process is due" is a *legal* question, "resolved by application of federal law," namely, the *Mathews* balancing test. *Barnes v. Pilgrim Psychiatric Ctr.*, 860 F. Supp. 2d 194, 202 (E.D.N.Y. 2012). *See also Soffer v. City of Costa Mesa*, 798 F.2d 361, 362-63 (9th Cir. 1986) (noting that application of the *Mathews* test is a "question of law" reviewable *de novo* on appeal); *Boyland v. Wing*, 487 F. Supp. 2d 161, 172 n. 3 (E.D.N.Y. 2007) ("whether the current procedures are constitutionally adequate" is "a legal issue"). Thus, while the court is required to "view the evidence in the light most favorable to the party opposing summary judgment [and] to draw all reasonable inferences in favor of that party," *Boyland*, 487 F. Supp. 2d at 165 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004)), once it has done so, the non-moving party is entitled to no special solicitude in the application of the law to the material facts.

defendants' moving Rule 56.1 Statement (Dkt. No. 134) "include[d] no factual assertions or evidence regarding the costs that would result from correcting bad mailing addresses." Pl. Recon. Mem. at 10. But plaintiffs themselves submitted the Comptroller's Report, which noted that, in order to "do research of addresses via the DMV database," NYCTA would have to "hir[e] seasonal employees." Comp. Rep. at 11. The Comptroller went on to recommend that the agency "do a cost benefit analysis" to make a "knowledge-based decision" on this and other potential methods of improving collections. *Id.* at ECF page 31.

Additionally, both parties submitted the testimony of TAB Executive Director Mary Ann Maloney (Maloney Dep.) (Dkt. Nos. 131-10, 135-3), who explained that "[w]hen we assessed that, the – the cost of doing that, and the level of staff that we would have to acquire to do that, and the volume, it just did not make sense." Maloney Dep. at 199. She added, "We don't have the resources to research and potentially get someone's new address. It just – it just doesn't make any – it's not feasible. We don't have staffing to implement that process. When you do the cost analysis, it doesn't make any sense." *Id.* at 199-200.[13] Relying on this testimony, plaintiffs asserted – and defendants agreed – that "TAB determined *after a cost analysis* that it would not attempt to use LexisNexis and/or the DMV address database to reduce the number of bad addresses in TABIS." *See* Def. Resp. to Pl. Local Rule 56.1 St. (Dkt. No. 145) ¶ 215 (emphasis added).[14] In short, while the

---

[13] Insofar as the summary judgment record reveals, plaintiffs made no further inquiry concerning the cost analysis performed.

[14] The Court could consider this evidence even if plaintiffs had not highlighted it through their Rule 56.1 Statement. Fed. R. Civ. P. 56(c)(3) permits the court to consider, on summary judgment, "other materials in the record," whether or not cited by the parties in their motion papers, and Fed. R. Civ. P. 56(e)(3) states that even "[i]f a party fails to properly support an assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it[.]" *See also Ayazi v. United Fed'n of Teachers Local 2*, 487 Fed. App'x 680, 681 (2d Cir. 2012) (citing Rules 56(c)(3) and 56(e)(3) and finding that "there was no error in the magistrate judge considering and relying on evidence not specifically cited by the [moving party] in its Local Rule 56.1 statement"); *Powlus v. Chelsey Direct, LLC*, 2011 WL 5244820, at *2

evidence on this point is "skimpy, Op. at 16, it is undisputed, and more than sufficient to support the Court's observation, when applying the third *Mathews* factor, that the DMV and/or LexisNexis research advocated for by plaintiffs would be "labor-intensive." Op. at 21.

The Court recognizes that where an agency's arguments against a due process challenge "focus on the allegedly prohibitive cost" of the additional steps demanded by the plaintiffs, the agency is expected to provide "a well-supported factual basis in the record for concluding that costs of more detailed notice would in fact be unduly burdensome." *Kapps v. Wing*, 404 F.3d 105, 124-25 (2d Cir. 2005) (rejecting agency's claim that the cost of including additional information in automatically generated notices would be "exorbitant" in light of testimony that its computer system could be modified "at the relatively modest cost of $75,000"). In *Jones*, however, the Court concluded, without *any* cost-benefit evidence, that the State was not required to search for a delinquent taxpayer's address in the phone book or income tax rolls, because it was obvious that such a search "imposes burdens on the State" that were "significantly greater" than sending the notice by first-class mail. 547 U.S. at 235-36. *See also Abdullah v. I.N.S.*, 184 F.3d 158, 165-66 (2d Cir. 1999) (reversing and remanding for entry of summary judgment in favor of immigration agency in reliance on appellate court's assumption that the government would face "great" "expense and difficulty" providing interpreters to non-English-speaking naturalization applicants, because it had received over 1.3 million applications and "a high percentage [of applicants] are not fluent in English").[15]

---

(S.D.N.Y. Nov. 1, 2011) ("In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants.").

[15] Similarly, in *Mathews* itself, the parties submitted "widely varying estimates of the probable additional financial cost" entailed in providing a hearing before social security disability benefits were discontinued, but the Court saw no need to resolve that dispute; it was enough that "the ultimate additional cost in terms of money and administrative burden would not be insubstantial." 424 U.S. at 347.

In this case, as noted above, the stakes are significantly lower than in *Jones* (and in *Abdullah*), as is the risk that any individual member of the class will be subject to a tax refund seizure, but the number of addresses that plaintiff would have defendants search for annually is very large, such that – according to both the Comptroller and TAB's Executive Director – the volume of work is beyond the capacity of the agency's existing staff. Comp. Rep. at 11; Maloney Dep. at 199-200. On these facts, plaintiffs – who bear the burden of proof on every element of their due process claim – cannot avoid summary judgment on the ground that defendants did not quantify the cost of the extra staff that would be required to perform those searches.

## Conclusion

For the reasons set forth above, plaintiffs' motion for partial reconsideration of this Court's Opinion and Order is GRANTED; however, upon reconsideration, the Court adheres to its conclusion that the notice that defendants provide to NOV respondents before seizing their tax refunds is constitutionally adequate. Op. at 21. The Clerk of Court is respectfully directed to close the motion at Dkt. No. 158.

Dated: New York, New York
       January 24, 2022                    **SO ORDERED**.

                                           **BARBARA MOSES**
                                           **United States Magistrate Judge**

17